Frank **ATONIO; Alan Lew; Curtis Lew; Eugene Bacliq; Joaquin Arruiza; Randy Del Fierro; Barbara Viernes; Clarke Kido; Lester Kuramoto; Margaret Baclig, Plaintiffs–Appellants,**

v.

**WARDS COVE PACKING COMPANY, INC., a foreign corporation; Bumble Bee Seafoods, Inc., a domestic corporation; Columbia Wards Fisheries, Defendants–Appellees,**

**and**

**United States of America, Intervenor.**

Nos. 91–35306, 91–35861.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 17, 1992.

Decided Dec. 7, 1993.

Abraham A. Arditi, Seattle, WA, for plaintiffs-appellants.

Douglas M. Fryer, Mikkelborg, Broz, Wells & Fryer, Seattle, WA, for defendants-appellees.

Thomas M. Bondy, Dept. of Justice, Washington, DC, for intervenor.

Beatrix W. Shear, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, Stephen C. Chin, Wilmer, Cutler & Pickering, and

Douglas S. McDowell, McGuiness & Williams, Washington, DC, for amici.

Before: WRIGHT, FLETCHER and CANBY, Circuit Judges.

CANBY, Circuit Judge:

Salmon cannery workers appeal from the district court's judgment dismissing with prejudice their claims of racial discrimination in employment. The defendants are three former employers. We ordered supplemental briefing on the question whether Title I of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071, 1071–81 (codified in scattered sections of 42 U.S.C.A.), applies to this case. We conclude that one of the provisions of the Act validly exempts this case from the Act's substantive provisions. Applying the earlier law, as well as the prior mandates of the Supreme Court and this court, we affirm in part, reverse in part, and remand for further proceedings.

I

This case has a long and complex history, of which only a small portion is relevant to this appeal. In 1974, nonwhite cannery workers brought an action in the United States District Court for the Western District of Washington to challenge employment policies and conditions at several canneries located in remote areas of Alaska. The complaint included claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1988 & Supp. III 1991).

The workers sought relief on their Title VII claims on theories of disparate treatment and disparate impact. They contended that their employers had confined them to relatively low-paying jobs, primarily cannery line positions. They asserted that job discrimination at the canneries appeared in many forms, two of which were the nepotistic hiring of whites for better-paying jobs and repeated failures to inform nonwhites of openings for those jobs. The workers also com-

plained that housing and messing facilities at the canneries were segregated routinely between whites and nonwhites, and that the employers engaged in or tolerated a system of race-labelling.

The district court rejected the workers' claims after a bench trial. First, it considered and rejected all of the workers' claims of disparate treatment. That ruling of the district court was left intact on a prior appeal, and the disparate treatment claims are no longer in issue.[1]

The district court next concluded that the workers had failed to make out a prima facie case of disparate impact in hiring or promotion. It found the workers' comparative statistics to be unreliable, and accepted the employers' evidence that no nepotistic hiring preference existed for whites in upper-level jobs. The court declined to consider the potential impact that subjective criteria, including impressions of experience and attitude, might have had on the canneries' hiring decisions. It further found that no impact on the workers had resulted from the housing and messing arrangements at the canneries.

A panel of this court affirmed the district court's judgment, but its opinion was withdrawn pending an en banc resolution of the subjective criteria issue. *Atonio v. Wards Cove Packing Co.*, 768 F.2d 1120 (9th Cir.) (*Atonio I*), *withdrawn, rehearing en banc granted*, 787 F.2d 462 (9th Cir.1985). The en banc court held that disparate-impact analysis could be applied to subjective hiring criteria. *See Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1482 (9th Cir.1987) (en banc).

After the en banc decision, the original three-judge panel resumed control of the case and vacated the district court's judgment for the employers. *Atonio v. Wards Cove Packing Co.*, 827 F.2d 439 (9th Cir.

1987) (*Atonio II*), *rev'd*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). The panel ruled that the workers' comparative statistics established a prima facie case of disparate impact in hiring and promotion. Those comparative statistics showed a much higher concentration of nonwhite employees in the cannery jobs than in the "at-issue" jobs outside the canneries. The panel accordingly ordered the case to be remanded and instructed the district court to evaluate the business necessity of practices which had yielded the disparity in proportions of nonwhites in cannery and non-cannery "at-issue" jobs. *Atonio II*, 827 F.2d at 444–45. The panel was also concerned that the district court had given inadequate attention to allegations of nepotism, and it accordingly ordered the district court to reexamine that issue. *See id.* at 445. The panel also instructed the district court to consider whether race-labelling,[2] separate hiring channels (including word-of-mouth recruitment among whites for upper-level jobs), subjective decision making, or segregated housing and messing individually created a disparate impact on the workers. *Id.* at 445–49.

The remand did not take place at that point, because the Supreme Court granted review and reversed. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 655, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989). Although the Court confirmed that subjective criteria are amenable to impact analysis, *see id.* at 648, 109 S.Ct. at 2120, it held that the comparative statistics on which *Atonio II* relied were incapable of establishing a prima facie impact case. *Id.* 490 U.S. at 650–55, 109 S.Ct. at 2124. The Court held that the proper comparison is not between the racial composition of the cannery work force and the "at-issue" work force, but rather between the racial composition of the labor market for

1. The district court determined that a combination of employment practices raised an inference of disparate treatment in hiring and promotion, but ultimately found that the canneries had not intended to discriminate against nonwhites. The workers challenged this determination in their first appeal, but we rejected their challenge in an opinion that was later withdrawn. *See Atonio v. Wards Cove Packing Co.*, 768 F.2d 1120, 1125–30 (9th Cir.) (*Atonio I*), *withdrawn, reh'g en banc granted*, 787 F.2d 462 (9th Cir.1985). On re-

mand of the case from the Supreme Court, the workers urged the district court to reconsider their disparate treatment arguments. The district court refused, and the workers have not asked us to review that decision. Accordingly, only the disparate impact claims are before us on this appeal.

2. "Race-labelling" refers to the practice of denominating groups of workers, and the facilities they use, by racial terms.

at-issue jobs and the racial composition of the at-issue work force. *Id.* 490 U.S. at 650–51, 109 S.Ct. at 2121–22. Otherwise, an employer whose hiring practices for noncannery "at-issue" jobs had no discriminatory impact could be penalized for having hired a high percentage of nonwhite workers for the cannery jobs. *See id.* at 654, 109 S.Ct. at 2123. The Court accordingly reversed and remanded for further proceedings to determine whether the workers could succeed in maintaining their claim under a proper impact analysis. *Id.* at 655, 109 S.Ct. at 2124.

The Supreme Court also addressed two other challenges to this court's method of dealing with specific employment practices in *Atonio II.* The Court said that where plaintiffs allege that more than one practice has created an adverse impact on minority hiring or promotion, the plaintiffs must "demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites." *Id.* 490 U.S. at 657, 109 S.Ct. at 2125. The Court also rejected a strict characterization of the "business necessity" defense, holding that "the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Id.* 490 U.S. at 659, 109 S.Ct. at 2126. The plaintiffs were to bear the burden of persuasion to disprove the existence of a business justification. *See id.* at 659–60, 109 S.Ct. at 2126.

The Supreme Court remanded the case to this court, and we in turn remanded it to the district court. The district court examined its prior decision and concluded that none of the specific employment practices that the workers identified had created an adverse impact. The court again found that the outward appearance of nepotism among upper-level employees had no substantive basis; the employees had not been hired because of their relationships. The court further held

that plaintiffs had failed to present a prima facie case on the basis of separate hiring channels, or subjective decision making. It also held that the workers had not made a prima facie impact case of segregated housing or messing, and that, in any event, there were sufficient business justifications for the employers' housing and messing practices. The workers once again appealed.

■■■ Ten months after the district court dismissed this case, but before this appeal was argued, Congress enacted the Civil Rights Act of 1991. The Act significantly modifies the rules that the Supreme Court announced in *Wards Cove.* For example, the Act permits a plaintiff to challenge an employer's "decisionmaking process" as one employment practice causing a disparate impact, upon a showing that the elements of that process are inseparable for analysis. 42 U.S.C. § 2000e–2(k)(1)(B)(i) (Supp. III 1991). In addition, it restates the business necessity defense and places on the employer the burden of proving that a practice causing a disparate impact is "job related for the position in question and consistent with business necessity." *See id.* § 2000e–2(k)(1)(A)(i). Nothing in the 1991 Act, however, modifies the central holding of *Wards Cove* that a disparate impact case cannot be established on the basis of a statistical disparity between the cannery work force and the noncannery "at-issue" jobs.

The 1991 Act also contains an unusual provision. Section 402(b) of the Act states:

CERTAIN DISPARATE IMPACT CASES.—Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983.

105 Stat. at 1099, *reprinted in* 42 U.S.C. § 1981 note at 717 (Supp. III 1991). The case before us is the only one that appears to meet the criteria prescribed by section 402(b) for exemption from the statute.[3] The work-

---

3. The workers contend that because this court rendered a decision on an interlocutory appeal prior to entry of the original judgment in the district court, section 402(b) does not apply to

this case. *See Atonio v. Wards Cove Packing Co.,* 703 F.2d 329, 332 (9th Cir.1982) (affirming the dismissal of a defendant named in the complaint because the claims against it were time-barred).

ers ask us to apply the general provisions of the Act to their case, which was pending when the Act was passed, and to reject as unconstitutional the exemption set forth in section 402(b). They also urge various errors in the district court's decision on remand. We have jurisdiction over their appeal under 28 U.S.C. § 1291.

## II

We deal first with the question of the applicability of the 1991 Act to this case. The canneries argue that we need not reach the question of the validity of section 402(b) because the entire Act is prospective, applying only to cases filed after the date of its enactment, November 21, 1991. If the Act is without retroactive effect, the workers cannot benefit from it in any event, and section 402(b) becomes superfluous.

■ The question of the retroactivity of the Act is not an easy one, and it will be some months before it is definitively settled. The Supreme Court has granted review in two cases that raise the issue, *Harvis v. Roadway Express, Inc.*, 973 F.2d 490 (6th Cir.1992), *cert. granted, in part,* —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993) (No. 92–938), and *Landgraf v. USI Filon Products*, 968 F.2d 427 (5th Cir.1992) *cert. granted, in part,* —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993) (No. 92–757), but no decision has been announced. In the meantime, this court, unlike some other circuits,[4] has held the Act to be retroactive. *Estate of Reynolds v. Martin*, 985 F.2d 470, 471 (9th Cir.) *reh'g en banc denied*, 994 F.2d 690 (9th Cir.1993). In light of that fact, and of our conclusion that this appeal can be resolved without further delay by treating the Act as retroactive, we do so. We therefore reach the question of the constitutionality of the exemption set forth in section 402(b).

We decline to read section 402(b) so narrowly. The legislative history, although ambiguous in other respects, makes clear that Congress had this case in mind when it enacted the exemption provision. *See, e.g.,* 137 Cong.Rec. H9505, 9506 (daily ed. Nov. 7, 1991) (statement of Rep. Wheat) ("[t]hose are the words that exempt one case, *Wards Cove Packing Co. v. Atonio*, from everything in this bill").

## A

The workers present three arguments to support their position that section 402(b) is unconstitutional. First, they contend that the provision violates the separation of powers. Next, they argue that it denies their rights to due process and equal protection. Finally, they maintain that it amounts to a bill of attainder. We address each argument in turn.

## 1

The workers, with some justification, characterize section 402(b) as an attempt by Congress to legislate an end to this litigation. The attempt, they contend, runs afoul of Article III of the Constitution. Their contention relies upon the well-known dictum contained in *United States v. Klein*, 80 U.S. (13 Wall.) 128, 146, 20 L.Ed. 519 (1872), which questioned Congress' power to "prescribe rules of decision to the judicial department of the government in cases pending before it."

■ We are not convinced that section 402(b) presents a genuine *Klein* issue. The provision does not purport to order any federal court to dismiss the workers' complaint, to enter judgment against them, or to make particular findings of fact or conclusions of law. Indeed, the judiciary remains free to decide this case and every issue in it by the same principles and law that prevailed prior to the passage of the 1991 Act.

In any event, the recent decision of the Supreme Court in *Robertson v. Seattle Audubon Soc.*, —— U.S. ——, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992), is fatal to the workers' contention that section 402(b) runs afoul of *Klein. Robertson* was a consolidation of two actions brought by Audubon Societies to challenge timber cutting in areas allegedly

**4.** *E.g., Baynes v. AT & T Technologies, Inc.,* 976 F.2d 1370 (11th Cir.1992); *Fray v. Omaha World Herald Co.,* 960 F.2d 1370 (8th Cir.1992); *Vogel v. City of Cincinnati,* 959 F.2d 594 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992).

inhabited by spotted owls, a threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531–1544 (1988 & Supp. III 1991). The complaints alleged violations of several federal statutes. While the litigation was pending, Congress enacted the so-called Northwest Timber Compromise, as an amendment to an appropriations act. The amendment set forth a compromise plan for timber harvesting, and provided:

> [M]anagement of areas according to subsections (b)(3) and (b)(5) of this section on the thirteen national forests in Oregon and Washington and Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases captioned. *Seattle Audubon Society et al. v. F. Dale Robertson,* ... and *Washington Contract Loggers Assoc. et al., v. F. Dale Robertson,* ... and the case *Portland Audubon Society et al., v. Manuel Lujan, Jr.* ...

Department of the Interior and Related Agencies Appropriations Act, § 318(b)(6)(A), Pub.L. No. 101–121, 103 Stat. 701, 747 (1990). The effect of this provision was to eliminate, by temporary amendment to the environmental laws, the primary statutory support for the Audubon Societies' claims. The Audubon Societies challenged this provision as a congressional interference with judicial powers conferred by Article III of the Constitution. *Robertson,* —— U.S. at ——, 112 S.Ct. at 1412. The Supreme Court rejected the Societies' challenge, holding that the quoted provision constituted a permissible change in the law, rather than a legislative direction of the result in pending litigation under existing law. *Id.* —— U.S. at ——, 112 S.Ct. at 1413–14. Even explicit references to pending cases, the Court indicated, failed to present a separation of powers problem. *See id.* —— U.S. at ——, 112 S.Ct. at 1414.

If the amendment in *Robertson* avoided separation of powers pitfalls, section 402(b) clearly does so as well, for it represents far less of an interference with the judiciary. Section 402(b) does not determine that a particular employment practice or business justification either satisfies or violates the requirements of Title VII. It leaves the courts free to determine the outcome of this litigation with all the latitude they would have had if the 1991 Act had never been passed.

### 2

■ Although section 402(b) does not violate the separation of powers, it does injure to a degree the due process and equal protection interests of the workers. The provision withholds from the plaintiffs of a single Title VII case benefits arising from a new law that is perceived to be favorable to Title VII plaintiffs. We must consider whether the infliction of these injuries amounts to a constitutional violation.

The workers urge us to apply heightened or strict scrutiny in making this determination. They assert that any more lenient standard is improper because section 402(b), while neutral on its face, in effect classifies Title VII plaintiffs on the basis of race. The canneries, and the United States as an intervening party, respond that the provision merely distinguishes among individual cases.

The language and effect of section 402(b) support the canneries' and the Government's interpretation. The provision is indeed targeted at a particular case, and not at a racial class or other category subject to special constitutional protection. Although section 402(b) does withhold the benefits of the Act from the plaintiffs in this case, it leaves other claimants of the same racial or ethnic groups free to invoke the Act in other cases. It is not possible to identify any racial classification by which Congress has differentiated these Title VII plaintiffs from others that are entitled to the benefits of the 1991 Act. Nor has Congress singled out Title VII plaintiffs as a class and imposed special disabilities on them. This case therefore differs from such cases as *Washington v. Seattle School District No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), in which the Supreme Court invalidated a statewide initiative that banned school bussing for desegregation but that permitted bussing for other purposes. Finding no suspect classification, we conclude that section 402(b) need satisfy only the ra-

tional basis test to survive the workers' constitutional challenge.

■ To pass muster under the rational basis test, a challenged statute or regulation must be "rationally related to a legitimate government interest." *Lyng v. International Union, UAW*, 485 U.S. 360, 370, 108 S.Ct. 1184, 1192, 99 L.Ed.2d 380 (1988) (internal citation omitted). The parties vigorously dispute whether a legitimate government interest underlies the provision at issue in this case.

The United States offers a rational after-the-fact explanation for Congress' enactment of section 402(b). Congress was aware, argues the Government, that this case has consumed enormous time and resources on both sides. Congress was also aware, the Government continues, that the Supreme Court's decision provided clear-cut legal standards with which to resolve the matter. "Congress could rationally conclude under these circumstances," the Government asserts, "that, although it wished to enact new statutory provisions, it did not wish to retroactively inject them into this lawsuit."

The workers, who offer statements of Members of Congress from the period when the Act was under consideration, impliedly ask us to reject the proffered rationale as a pretext. The statements indicate that several Members were troubled by the apparent unfairness of the provision. Moreover, a few Members acknowledged that section 402(b) was a product of special-interest lobbying. *See, e.g.*, 137 Cong.Rec. H9516 (daily ed. Nov. 7, 1991) (statement of Rep. Moran) (calling section 402(b) the results of a "political deal cut in the Senate.")

■ The relevance of these statements to our analysis, however, is marginal. A ration-

al basis need not be one that actually motivated Congress. *See Flemming v. Nestor*, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960). It is enough that plausible reasons for Congress' action exist. *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). Under the minimum standard of rationality, the reason proffered by the Government qualifies as plausible and sufficient.[5]

■ It is true that there is something jarring about legislation that is aimed at an individual target. The Supreme Court responded to that notion in *Morey v. Doud*, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), which invalidated on equal protection grounds an Illinois statute that exempted the American Express Company by name from requirements that the statute imposed on other firms that sold money orders. Less than twenty years later, however, the Supreme Court overruled *Morey*. *See City of New Orleans v. Dukes*, 427 U.S. 297, 306, 96 S.Ct. 2513, 2518, 49 L.Ed.2d 511 (1976) (calling *Morey* "a needlessly intrusive judicial infringement on the State's legislative powers"). Under the philosophy of *Dukes*, we generally lack authority to invalidate a public law under the rational basis test merely because that law narrowly targets one or a few individuals. *Cf. Central States, Southeast & Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339 (7th Cir.) (rejecting equal protection challenge to an amendment voiding a single firm's withdrawal liability under the Multiemployer Plan Amendments to ERISA (the federal pension law), 29 U.S.C. §§ 1381–1453 (1988 & Supp. III 1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992)).[6]

---

**5.** We also find nothing in the record that would permit a conclusion that Congress' only purpose was to harm a politically unpopular group. *See United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (invalidating statutory provision intended to prevent "hippies" from participating in food stamp program).

**6.** In *Central States*, an employer withdrew from a multiemployer retirement fund after the effective date of the Multiemployer Pension Plan Amendments to ERISA. A pension fund sued the em-

ployer for withdrawal liability under the statute. The employer obtained from Congress an amendment to ERISA, tailored to it alone, voiding its withdrawal liability. *Central States*, 960 F.2d 1340–42.

Upon an equal protection challenge to the amendment, the Seventh Circuit observed:

To say that Congress cannot honor an equitable claim for exemption from a harsh law merely because it is the claim of only one firm—that a federal statute cannot have only one beneficiary—would be tantamount to rul-

The workers cite a recent case which outwardly seems to resurrect the rule of *Morey*. In *News America Pub., Inc. v. FCC*, 844 F.2d 800 (D.C.Cir.1988), a court of appeals invalidated the so-called Hollings Amendment, which in part barred the Federal Communications Commission from using its 1988 appropriation to extend waivers of newspaper-broadcast cross ownership rules. *See id.* at 802. The plaintiff in the case was the only holder of such a waiver. "Nowhere are the protections of the Equal Protection Clause more critical," said the D.C. Circuit, "than when legislation singles out one or a few for uniquely disfavored treatment." *Id.* at 813.

*News America*, however, was not decided under a rational basis standard of review. The decision was founded as much in First Amendment concerns as it was in equal protection; the court said that more than " 'minimum rationality' " would have been necessary to save the Amendment. *Id.* at 814. The court relied on precedents drawn almost exclusively from the field of broadcast regulation, where heightened scrutiny of even non-content-based regulation is common. *See, e.g., id.* at 813 (citing *Community–Service Broadcasting of Mid–America, Inc. v. FCC*, 593 F.2d 1102 (D.C.Cir.1978) (en banc)).[7] We do not view *News America* as applicable to our case, nor do we accept it as casting doubt on the Supreme Court's view that "mere underinclusiveness is not fatal to the validity of a law under the equal protection component of the Fifth Amendment, . . . even if the law disadvantages an individual or

identifiable members of a group." *Nixon v. Administrator of Gen'l Servs.*, 433 U.S. 425, 471 n. 33, 97 S.Ct. 2777, 2804 n. 33, 53 L.Ed.2d 867 (1977).[8]

We conclude that section 402(b) does not violate the equal protection component of the Fifth Amendment.

### 3

■ The workers' *amici* contend that section 402(b) is an unlawful bill of attainder under Article I, section 9, clause 3 of the Constitution. A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of Gen'l Servs.*, 433 U.S. at 468, 97 S.Ct. at 2803. A given statute must satisfy three requirements to meet this definition: "specification of the affected persons, punishment, and lack of judicial trial." *Selective Serv. Sys. v. Minnesota Pub. Int. Research Group*, 468 U.S. 841, 847, 104 S.Ct. 3348, 3352, 182 L.Ed.2d 632 (1984). Section 402(b) falls short of the recognized threshold.

■ It is clear that section 402(b) meets the specificity requirement. A statute need not identify individuals by name to incur suspicion. A law that defines a class of persons on the basis of "irreversible acts committed by them" is adequately specific. *Id.* at 847–48, 104 S.Ct. at 3352–53 (discussing *Cummings v. Missouri*, 71 U.S. (4 Wall.)

---

ing private bills unconstitutional, a step that we are naturally reluctant to take. . . .
*Id.* at 1344. Applying the rational basis test, *see id.* at 1343, the court found the amendment constitutional. *See id.* at 1347.

7. The D.C. Circuit in *Community–Service Broadcasting* observed:

. . . where noncontent-based distinctions are drawn in a statute affecting First Amendment rights, the Supreme Court has held that the government interest must be "substantial" and the statutory classification "narrowly tailored" to serve that interest if the statute is to withstand equal protection scrutiny.
*Community–Service Broadcasting*, 593 F.2d at 1122.

8. We also view as inapplicable the line of cases, relied upon by the workers, in which the Su-

preme Court has struck down discriminatory state tax provisions for lack of a rational basis. *See, e.g., Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985) (invalidating property tax exemption for certain resident veterans); *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989) (finding equal protection violation where tax assessor valued land only upon its transfer, where state law required uniform property taxes). The state tax cases may genuinely be viewed as *sui generis;* it is an area where the Supreme Court has remained active long after ceasing to invalidate other economic legislation on equal protection grounds. *See Central States*, 960 F.2d at 1343 (7th Cir.1992) ("[t]he Supreme Court continues to invalidate discriminatory state taxes," but persons challenging other economic regulation for lack of rational basis face "extraordinary and perhaps insuperable burden").

277, 18 L.Ed. 356 (1867) and *Ex Parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867)).[9] The statute in this case defines a class composed solely of these plaintiffs on the basis of their having brought this action against the canneries.

■ Specificity alone, however, is not enough to implicate the attainder clause. This court recently cautioned that "[a]n otherwise valid law is not transformed into a bill of attainder merely because it regulates conduct on the part of designated individuals or classes of individuals." *Fresno Rifle & Pistol Club, Inc. v. Van de Kamp,* 965 F.2d 723, 727 (9th Cir.1992). If an otherwise valid law were so transformed, the ban on bills of attainder would be difficult to distinguish from the guarantee of equal protection. *See id.*

■ Therefore, the element of punishment remains essential. A statute inflicts forbidden punishment when it: (1) falls within the historical meaning of legislative punishment; (2) furthers no nonpunitive legislative goals; and (3) evinces Congress' intent to punish, as reflected in the legislative record. *Selective Serv.,* 468 U.S. at 852, 104 S.Ct. at 3355. Section 402(b) satisfies none of the three punishment criteria.

■ From a historical standpoint, the Supreme Court's broad reading of the term "punishment" has never been extended to the degree the workers seek. Aside from expected examples such as death, imprisonment, fines, or confiscation, the concept usually has been confined to bans on entry into a particular profession or business. *See* Lawrence H. Tribe, *American Constitutional Law* § 10–5, p. 651 (2d ed. 1988). Broader readings, similar to the one presented here, have failed to persuade the Supreme Court. In the *Selective Service* case, for example, the Court said that college students who refused to register with the Selective Service suffered no punishment when they were refused financial aid pursuant to an Act of Congress. *Selective Serv.,* 468 U.S. at 852–56, 104 S.Ct. at 3355–57.

■ In this case Congress was aware that it was imposing a burden on the workers when it enacted section 402(b). Nothing in the record suggests, however, that Congress intended to punish the workers for filing and maintaining this action. Rather, it appears that Congress' primary concern, or at least the concern of the Members who offered the amendment, was to relieve the canneries from the cost of additional litigation. That concern may have been a product of special interest lobbying, but it was nevertheless a permissible legislative end. *Cf. Central States,* 960 F.2d at 1342 ("[m]uch modern legislation involves targeting government largesse on politically influential groups and the burdens of government on politically impotent ones").

Finally, section 402(b) does not purport to impose a punishment without judicial trial. We conclude that section 402(b) does not constitute a bill of attainder.

### B

In sum, section 402(b) amends prior law without mandating a particular result, thereby avoiding separation of powers problems. The provision is not amenable to strict or intermediate scrutiny for purposes of due process or equal protection, and it satisfies the rational basis test. Nor is the provision a bill of attainder. We conclude, therefore, that section 402(b) of the Civil Rights Act of 1991 is constitutional as applied in this case. We proceed, then, to address the workers' contentions without regard to the 1991 Act.

### III

■ The Supreme Court reversed *Atonio II* on the specific issue of the use of comparative statistics, and articulated general rules governing disparate impact claims under Title VII. The Supreme Court's decision im-

---

**9.** The Supreme Court in *Cummings* struck down a provision of Missouri's Reconstruction Constitution which barred persons from certain professions unless they swore under oath that they had not aided the Confederacy. *See Cummings,* 71 U.S. (4 Wall.) at 279. *Garland,* decided the same day as *Cummings,* invalidated a federal statute requiring a similar loyalty oath from attorneys as a condition for admission to practice before the federal courts. *See Garland,* 71 U.S. (4 Wall.) at 377.

posed the following requirements on the workers for them to prevail on their disparate impact claims: first, they must show that a specific employment practice has caused a significant disparate impact on employment opportunities for nonwhites in the at-issue jobs. *Wards Cove*, 490 U.S. at 657, 109 S.Ct. at 2125. If they succeed in doing so, and the employer offers a business justification for the practice, the workers must then either meet the burden of persuasion in disproving the existence of a business justification for an identified impact, *id.* at 659–60, 109 S.Ct. at 2126, or propose equally effective alternatives to the challenged practice. *Id.* at 661, 109 S.Ct. at 2127.

### A

■ The record before us reveals that most of the workers' claims fail to make out prima facie cases of disparate impact under the requirements of *Wards Cove*. The workers assert, among other things, that the canneries routinely hire relatives, rely upon subjective hiring criteria, and maintain segregated messing facilities. They contend that each of those alleged practices created a disparate impact on nonwhite job seekers. The district court disagreed, and its findings on those claims contain no clear error.

### 1

We examine initially the workers' challenge to the figures adopted by the district court for persons in the labor market available to fill at-issue jobs. The defendants derived those figures from census data, and the figures purport to show the availability of whites and nonwhites for at-issue jobs. The defendants' figures conceive a labor pool that is approximately 90% white. If the 90% figure is accepted, only 4 of 138 at-issue job "families" (groupings of related jobs) contain a disproportionate number of white employees. Although a showing of no or little disparity at the "bottom line" is not fatal to a disparate impact claim, *see Connecticut v. Teal*, 457 U.S. 440, 451, 102 S.Ct. 2525, 2533, 73 L.Ed.2d 130 (1982), that showing makes the workers' case much more difficult.

■ At trial the workers viewed the heavily nonwhite, cannery work force itself as the primary, if not exclusive, labor pool for the at-issue jobs. The Supreme Court squarely rejected that view in *Wards Cove* because the cannery-worker pool excluded qualified persons outside the canneries and included unqualified persons within them. *Wards Cove*, 490 U.S. at 651–52, 109 S.Ct. at 2121–22. The district court on remand adhered to the defendants' labor market figures, rejecting the workers' arguments that the figures counted whites who were unwilling to take migrant or seasonal work, or to work in the canning industry.

We find no clear error in the district court's reliance on defendant's figures extrapolated from census data. We presume that had the district court adjusted the census numbers as the workers desired, the revamped statistics would have shown more racial disparity in the four job families in which whites are overrepresented, even under the unreformed census statistics. It also may be true that revamped census data would show bottom-line disparity in additional at-issue job families. The workers fail to specify, however, the degree of change that each modification would yield. They make only an unsupported statement that the adjustments would produce rough agreement between the census and industry numbers in the nonwhite availability figure for at-issue jobs. That statement is not enough for us to overturn the district court's findings, particularly in the absence of a viable competing proposal from the workers.

The workers sought more on remand than merely to reform the census data; they renewed their effort to substitute their own labor pool statistics. They broadened their conception of the pool from that which they had presented to the Supreme Court. They relied on data, which they had introduced at trial, that described employment patterns in the entire Alaskan salmon canning industry. Those data show that the percentage of nonwhites working in the Alaskan salmon canning industry during 1970–78 was 48%. From 1906 to 1939, and from 1941 to 1955, the percentage varied between 47 and 70%. The district court accepted those figures after trial as an accurate portrayal of the racial composition of the entire canning industry

work force. The court refused, however, to find that the industry numbers defined the labor pool for at-issue jobs.

 . We too are unconvinced that industry statistics, rather than census data, yield a more accurate picture of the at-issue labor market. The industry numbers suffer from the same deficiency that plagued the workers' original labor pool numbers. The workers offer no evidence to determine how many nonwhite industry workers labored in at-issue, as opposed to cannery, jobs. To the extent that the 48% figure includes cannery workers who were unqualified for at-issue jobs, the industry statistics are overinclusive. They also may be underinclusive for failing to count persons who were available and qualified for at-issue work, but who had not worked previously in the industry. The industry numbers therefore fail to meet the requirements established by the Supreme Court in *Wards Cove*, 490 U.S. at 650–51, 109 S.Ct. at 2121–22.

 The workers also had compiled, as an alternative to the industry data, a statistic that 26% of those who identified their ethnicity on written applications were nonwhite.[10] The district court said that the 26% applicant flow figure was the workers' strongest argument in favor of modifying or throwing out the defendants' labor pool numbers. However, the court ultimately found that the defendants' numbers were more credible than the applicant flow statistic.[11]

That finding, too, was not clearly erroneous. The data from which the applicant flow statistic was derived made no distinction among those applying for at-issue and for other jobs. Although it appears that written applications for cannery jobs were uncommon, they were not extraordinary. Moreover, even if the applications were addressed only to at-issue jobs, there is no way of knowing how many of those persons were qualified for those jobs. Notwithstanding

the workers' position that no objective hiring criteria exist for any at-issue job, we cannot assume that anyone who applied for an at-issue job was qualified.

The workers offered no further evidence of a clearly superior substitute for the defendants' labor pool figures. They observe that bottom-line disparity exists, even under those figures, in four of 138 at-issue job families. However, the workers have produced nothing to link even that disparity to one or more specific employment practices. We cannot presume the existence of an impact without proof of that causal link. *See Wards Cove*, 490 U.S. at 657, 109 S.Ct. at 2125 (plaintiffs must "specifically show that each challenged practice has a significantly disparate impact"). Because the workers failed to sustain their burden to offer a more reliable alternative than that proffered by defendants, the district court committed no clear error when it adopted the defendants' model of the at-issue labor market.

2

 We decided in our en banc proceeding in this case that subjective hiring criteria are amenable to impact analysis. *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1482 (9th Cir.1987) (en banc). We offered little guidance, however, on what kind of showing is sufficient to make out a prima facie case. The difficulties are obvious: how does one show that the application of variable concepts such as "experience" create racial disparity between those hired and those qualified for jobs? *Atonio II* had suggested one course: the workers should present statistics showing a bottom line disparity as prima facie evidence of impact, and then should identify practices which *could have caused* that disparity. *See Atonio II*, 827 F.2d at 444 ("we stress that such statistics can serve to demonstrate the consequences of discriminatory practices which have already been independently established") (citation omitted).

---

**10.** The workers believe that the 26% figure is too low, but they rely upon that figure to make their argument. We decline to speculate whether a higher percentage is more accurate.

**11.** The district court also found the 26% figure unreliable because only some at-issue job applicants identified their race on written applications. We need not address that finding because we agree with the district court that the defendants' labor market numbers are more credible than the applicant flow statistic.

The Supreme Court rejected that course in *Wards Cove*. In refusing to ease the plaintiffs' causation burden with regard to subjective criteria claims, the Court said:

> Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.

*Wards Cove,* 490 U.S. at 656, 109 S.Ct. at 2124 (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 2788, 101 L.Ed.2d 827 (1988) (plurality opinion)).

 We are acutely aware of the difficulty that the strict causation requirement adopted in *Wards Cove* creates for these plaintiffs in challenging subjective hiring criteria. Nevertheless, we conclude that there is no basis under *Wards Cove* to remand the subjective hiring criteria claims in this case. The workers have argued consistently that there are no objective standards, except for an English language requirement, that govern hiring for at-issue jobs. The employers respond by identifying objective criteria for individual families of at-issue jobs, and for the at-issue jobs as a whole. The district court, in both its original and supplemental opinions, found that the existence of those criteria prevented the workers from making out a prima facie case.

 The workers argue before us now that the opinion on remand violated an instruction contained in *Atonio II* that the district court determine whether each objective standard had been actually applied in a consistent manner. *See Atonio II,* 827 F.2d at 446. That instruction conforms to the rule "that only 'non-discriminatory standards *actually applied* by employers are pertinent in a discrimination case.'" *Id.* (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 773, n. 32, 96 S.Ct. 1251, 1268, n. 32, 47 L.Ed.2d 444 (1976)) (emphasis in original). *Wards Cove* had no effect upon *Atonio II*'s instruction.

The district court did fail to rule whether the objective hiring criteria had been actually applied. That failure, however, provides no basis for a remand on this issue. There is nothing in this record upon which the workers can rely to show that a racial disparity in hiring arises from the use of subjective hiring criteria. Subjective hiring decisions are not discriminatory per se, *Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30,* 694 F.2d 531, 554 (9th Cir.1982), and our acceptance of the defendants' labor pool figures leaves only minimal evidence of racial disparity at the bottom line. There is no evidence to link any bottom-line disparity to the use of subjective hiring criteria. Therefore, we accept the district court's findings.

### 3

The parties agree that there were incidents of related whites holding at-issue jobs in the canneries, and the district court presumed that the number of those incidents was statistically significant. The court on remand, however, found that these employees were not hired on the basis of a preference for relatives. The court found instead that the employees had been hired on the basis of their qualifications. The court thus determined that no nepotism existed in hiring for the at-issue jobs.

The district court's finding could be viewed to conflict with the language of *Atonio II,* which stated:

> That the [district] court found individuals were hired for their skills and not because they were relatives serves to dispel the inference of discriminatory intent but it does not meet the defendants' burden in refuting a claim of disparate impact. What is required is that the defendants prove the business necessity of the nepotism policy.

*Atonio II,* 827 F.2d at 445.

However, *Atonio II* made no explicit finding that related persons in upper-level jobs had been hired because they were relatives. Instead, the opinion rests on an assumption that the district court had found nepotism to exist at the canneries. This assumption, in turn, arose from language in the district court's original opinion that described hires of related whites as "nepotistic" hires. The court in *Atonio II* was troubled by the contradiction in the district court's apparent findings that nepotism was present, but that

there existed no hiring preference for relatives. "If nepotism exists," said the court in *Atonio II*, "it is by definition a practice of giving preference to relatives...." *Id.*

 The district court on remand qualified the language it used in its original decision, thereby removing the basis for the assumption of nepotism that underlay *Atonio II*. The term "nepotism," said the district court,

> was used only in its general sense, that being that the plaintiffs introduced evidence that a substantial number of the employees of the defendants were related. This court did not find in its original Opinion, and does not now find, that the defendants favored applicants by reason of their being related to other employees. The evidence is to the contrary.

We accept the district court's acknowledgement that it used the term "nepotism" in an inaccurate way in its original opinion. In our view, nepotism exists when relatives are preferred because of their relationship, whether they are qualified or not. The district court's factual finding, however, is that applicants were not favored because of their relationship. That amounts to a finding that nepotism did not exist. The workers have failed to show that this finding is clearly erroneous; their failure is attributable to the same flaw that plagues much of their case—lack of reliable statistical data.[12]

 We recognize that nepotism conceivably may have an impact not only on the decision to hire, but also on the decisions to interview, to solicit applications, or to otherwise permit access to at-issue jobs. *See, e.g., Thomas v. Washington County Sch. Bd.*, 915 F.2d 922, 925 (4th Cir.1990) ("whatever the

benefits of nepotism ..., those benefits are outweighed by the goal of providing everyone with equal opportunities for employment") (citing *inter alia, Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1303 (9th Cir.1982), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984)). Although there were hints of a preference for interviewing related whites in a few job families, there is insufficient evidence, statistical or otherwise, to establish that such a preference actually existed or was a widespread practice. We cannot say that the district court clearly erred; thus, no remand is warranted on the workers' nepotism claim.

4

 *Atonio II* was somewhat equivocal in its instructions to the district court regarding segregation in messing at the canneries. The court found no clear error in the district court's finding that the segregated messing arrangement was attributable to a local union, whose membership is predominantly Asian and Filipino cannery workers. Those workers preferred an oriental menu. *See Id.* Noting, however, that an agreement with a union provides no immunity for an employer from a discrimination claim, the court in *Atonio II* instructed the district court to investigate further the workers' messing claims. *Id.* (citing *Williams v. Owens–Illinois, Inc.*, 665 F.2d 918, 926 (9th Cir.), *cert. denied*, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982)).

On remand the district court ruled that segregated messing created no disparate impact. The court supported its ruling with a finding that the cannery workers were allowed to change their messing assignment if

---

12. The district court found that the plaintiffs' related hire statistics were flawed because they counted persons who married workers in the same department after those persons had already been hired. The defendants also argue that the numbers often count each pair of relatives, the new and established at-issue employee, as two related hires. The workers do not contest that argument, but counter that it is the defendants' burden to show that curing the flaws would remove any statistical disparity. We disagree. The flaws in the workers' related hire statistics do more than render their analysis less precise. *See Equal Opportunity Employment Comm'n v.*

*General Tel. Co. of Northwest, Inc.*, 885 F.2d 575, 582 (9th Cir.1989), *cert. denied*, 498 U.S. 950, 111 S.Ct. 370, 112 L.Ed.2d 332 (1990). The plaintiffs' reluctance to estimate the significance of the flaws strongly suggests that the flaws seriously undermine any inference of discrimination arising from the related hire statistics. *Id.* (discussing *Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458 (9th Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987)). In any event, we accept the district court's finding that persons were not hired because they were relatives.

they wished to eat with the skilled workers. Nothing in the district court's decision on this issue conflicts with *Atonio II,* and nothing in the record suggests that the finding of fact is clearly erroneous. We therefore affirm the district court's ruling with regard to messing arrangements.

**B**

Our outcome is different with regard to disparate impact claims arising from allegations of separate hiring channels, racially-segregated housing, and the race-labelling of jobs, housing, and messing.

**1**

The canneries concede that they employed word-of-mouth recruiting for upper level jobs, but vehemently dispute the existence of separate hiring channels.[13] The district court did not address these allegations specifically in its original decision, but on remand found as a fact that no separate hiring channels existed.

That finding arguably violated the mandate of *Atonio II.*[14] There we found sufficient indication that the district court had implicitly considered the separate hiring channels issue. *Atonio II,* 827 F.2d at 446. We then said:

> The defendant companies do not claim their practices have no impact, rather they assert business justifications for the practices. They say there are no people qualified for skilled jobs in the channels they tap for cannery worker positions, namely Local 37 and the Native villages. However, in considering the claims of the twenty-two individuals who alleged they had been

discriminated against, the district court did not find they lack qualifications, but that they did not make timely applications. Thus, there is evidence that some of the people counted in the comparative statistics may be qualified for skilled jobs, and it is not disputed they could fill the at-issue unskilled jobs.

*Id.* at 447. We observed that word-of-mouth recruiting by predominantly white superintendents and foremen, recruiting among native villagers only for cannery jobs, and securing cannery workers through Local 37 each contributed to a sense that separate hiring channels did in fact exist at the canneries. *See id.* at 446–47.

 *Atonio II* gave somewhat ambiguous instructions to the district court regarding what to do on remand with the fact of separate hiring channels. We suggested that separate hiring channels are per se discriminatory, *see id.* at 447 (citing *Barnett v. W.T. Grant Co.,* 518 F.2d 543, 549 (4th Cir.1975)), and that it was up to the canneries to prove the business necessity of the practice. *Id.* However, earlier in our discussion of the issue we said "that such practices [word-of-mouth recruiting, etc.] can cause a discriminatory impact is obvious." *Id.* at 446 (citing *Domingo v. New England Fish Co.,* 727 F.2d 1429, 1435–36 (9th Cir.) (per curiam), *modified,* 742 F.2d 520 (9th Cir.1984)).

In light of the causation discussion contained in *Wards Cove,* we interpret *Atonio II* as having instructed the district court to determine initially whether separate hiring channels caused a disparate impact on nonwhites. The district court failed to do that

---

**13.** We consider these allegations together because the workers presented them in that manner.

**14.** We find nothing in the Supreme Court's opinion that opened the door for the district court to create this conflict on remand. The Supreme Court reversed *Atonio II* solely on the basis of our error in giving credit to the workers' comparative statistics. In footnote 9 of the opinion, the Supreme Court briefly offered its characterization of the disposition of other issues in *Atonio II*:

> As we understand the opinions below, the specific employment practices were challenged only insofar as they were claimed to have been

responsible for the overall disparity between the number of minority cannery and noncannery workers. The Court of Appeals did not purport to hold that any specified employment practice produced its own disparate impact. . . .

*Wards Cove,* 490 U.S. at 655 n. 9, 109 S.Ct. at 2124 n. 9. We refuse to read the footnote as either an adjudication on the merits of the other issues or as a definitive reading of the relevant portions of *Atonio II.* The writ of certiorari in *Wards Cove* did not grant review on any ruling of *Atonio II* that identified an impact arising from a specific employment practice.

on remand because it erroneously found that no separate hiring channels exist. We therefore remand again for the district court to take up the inquiry where *Atonio II* left off.

The defendants argue that no remand is necessary because their labor market figures show that, of Alaska natives hired for at-issue jobs, the majority of those natives were nonwhite. In addition, the district court had found that nonwhites were free to apply for at-issue jobs. Neither of those considerations avoids the need for a remand.

As with the practice of nepotism, separate hiring channels can deprive job seekers of information that at-issue jobs are available. *See, e.g., United States v. Ironworkers Local 86,* 443 F.2d 544, 548 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) (identifying an impact where whites were actively recruited, and nonwhites were given "little or no publicity or information concerning procedures for gaining ... opportunities"). The potential impact goes beyond an effect on who is actually hired, or even who receives an interview. The number of nonwhite hires and the freedom to apply are immaterial if the workers can show that separate hiring channels make it difficult for them as a class to learn of opportunities for at-issue jobs.

It is true that our acceptance of the defendant's labor pool statistics will make it very difficult for the workers to use hiring statistics as prima facie evidence of disparate impact. Furthermore, we have discredited the workers' only applicant flow statistic. There remain, however, the individual claims of deterrence that we recognized in *Atonio II. See Atonio II,* 827 F.2d at 447.

The district court refused to consider those claims because it found that the individual workers had failed to submit timely written applications. *Id.* We found that rationale unacceptable in *Atonio II,* concluding that the existence of separate hiring channels and lack of publicity excused workers "from the necessity of establishing the timeliness of

their applications and automatically elevat[ing] oral inquiries to the status of applications." *Id.* at 449 (citing *O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 868 (9th Cir.1982) *overruled on other grounds, Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477, 1481–82 (9th Cir.1987) (en banc); and *Domingo,* 727 F.2d at 1445). We remand for the district court to determine initially whether the fact of separate hiring channels, with its accompanying practices, deterred the individual claimants from applying for at-issue jobs. If the court finds that an impact did arise, the canneries will be responsible for articulating a business justification for separate hiring channels.[15]

2

This court in *Atonio II* concluded that segregated housing at the canneries provided a basis for a prima facie claim of disparate impact. "The impact is clear," we said, observing that the segregated bunkhouses "aggravated the isolation of the nonwhite workers from the 'web of information' spread by word-of-mouth among white people about the better paying jobs." *Id.* at 448. On remand, however, the district court found that segregated housing created no adverse impact. Although this finding conflicts with *Atonio II,* the court went on to identify a potentially valid business justification for the situation under the rules articulated by the Supreme Court.

At trial the employers had presented evidence that employees were assigned housing according to their time of arrival, and that the at-issue workers arrived first and were assigned to winterized bunkhouses. When the cannery workers arrived later in the season, they were assigned to non-winterized bunkhouses because it was then warm enough to make winterized housing unnecessary. The employers argued that winterizing all bunkhouses would be unnecessarily costly. The district court accepted this explanation for the segregated housing, but this

---

**15.** Because the basis of the remand includes a claim of disparate impact arising from an alleged hiring practice, it is too early to say that the canneries' rehire preferences have no discriminatory impact in and of themselves. If the district court determines that separate hiring channels have a disparate impact, it must then consider anew the effect, if any, of the rehire preferences.

court in *Atonio II* was skeptical. Efforts to economize, we said, were a business necessity only if "clearly necessary to promote the proficient operation of the business." *Atonio II*, 827 F.2d at 448. Even if the aim of economy was a business necessity, *Atonio II* continued, the workers deserved an opportunity to present means by which economizing could be achieved with a smaller impact on non-whites at the canneries. *Id.* *Atonio II* required the district court to reconsider the employers' explanation in light of the then-prevailing standard.

The Supreme Court, however, eased the standard for evaluating business justifications, and the district court properly applied the revised standard to the facts of this case. A business justification for a challenged practice, said the Supreme Court, need not be "essential" or "indispensable" to the business to rebut the prima facie impact case. *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2126. Instead, the proffered justification need only serve "the legitimate employment goals of the employer." *Id.* The district court on remand found again that the employer's interest in saving money justified its failure to winterize all of the bunkhouses. Although economizing in this way may have been unnecessary to the canneries' success or survival, we cannot say that it fails to serve the legitimate goal of reducing operating costs.

But the existence of a business justification is insufficient if the plaintiffs show that less onerous alternatives to segregated housing exist. *See Id.* at 660–61, 109 S.Ct. at 2126–27.[16] At the post-remand hearing, the district court invited the workers to submit alternatives. The plaintiffs offered two in their supplemental briefs. The district court failed to address the feasibility of alternatives, but merely restated that segregated housing had a business justification.

First, the workers suggested that the canneries assign preseason workers to the larg-est bunkhouses. Any remaining space, they continued, could be assigned to cannery workers. The record before us, however, undermines the feasibility of this alternative. The largest bunkhouses were not winterized; to follow the workers' suggestion would require the very expenditure which the canneries sought to avoid.

Second, the workers noted that a white superintendent had testified that a number of preseason workers changed bunkhouses at the start of the canning season. It might be possible, they suggest, to require such moves as a matter of company policy. We cannot say upon this record whether that proposal would prove as effective in avoiding expense as the current arrangement. Plaintiffs are entitled, however, to have the district court consider the feasibility of this second potential alternative. Accordingly, we remand the housing impact claims for a feasibility determination. *See Wards Cove*, 490 U.S. at 660–61, 109 S.Ct. at 2126–27.

### 3

In *Atonio II*, we observed that "[r]ace labelling is pervasive at the salmon canneries, where 'Filipinos' work with the 'Iron Chink'[17] before retiring to their 'Flip' bunkhouse." *Atonio II*, 827 F.2d at 447. Similar statements of management representatives appear in the record, each acknowledging the long-term existence of segregated housing and messing and the association of certain jobs and facilities with nonwhites. At trial the district court found these statements disturbing, but also found them insufficient to raise an inference of an intent to discriminate. In *Atonio II*, we replied: "Perhaps not, but the district court must carry the analysis further and consider whether such a practice has any adverse impact upon minority people, *i.e.*, whether it operates as a headwind to minority advancement." *Id.* The

---

16. In the Court's language,

[i]f respondents, having established a prima facie case, come forward with alternatives to petitioners' hiring practices that reduce the racially disparate impact of practices currently being used, and petitioners refuse to adopt these alternatives, such a refusal would belie a claim by petitioners that their incumbent practices are being employed for nondiscriminatory reasons.

*Wards Cove*, 490 U.S. at 660–61, 109 S.Ct. at 2126–27.

17. The employers state that "Iron Chink" is the trademarked name of a particular processing machine.

Supreme Court, in reviewing *Atonio II*, did not reach the race-labelling issue, so our directive to the district court remained intact. On remand, however, the district court failed to address the race-labelling issues.

We therefore remand to the district court with instructions to follow our prior directive. We also call attention to the Supreme Court's most recent comments dealing with a hostile work atmosphere. "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' ... that is 'sufficiently severe or pervasive to alter the conditions of the victims' employment and create an abusive working environment,' ... Title VII is violated." *Harris v. Forklift Systems, Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (U.S.1993) (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 2404, 2405, 91 L.Ed.2d 49 (1986); some internal quotations omitted). The district court should accordingly determine whether race labelling created a discriminatory impact of its own force. The district court should also consider the extent to which this practice may have had an adverse impact on integrated messing and bunking or on minority applications for or hiring into at-issue jobs.

## IV

The district court awarded the employers their costs. Because we reverse in part the judgment dismissing the workers' claims, the employers are no longer necessarily a prevailing party entitled to costs. Accordingly, we vacate that award. *See Garrett v. City & County of San Francisco*, 818 F.2d 1515, 1521 (9th Cir.1987).

The employers and workers each seek an award of attorneys' fees for this appeal. We decline to award fees to the employers under Fed.R.App.P. 38, for this appeal presented serious questions of law and therefore cannot be viewed as frivolous.

As for the workers, we leave for the district court to consider whether they are entitled to fees under 42 U.S.C. § 2000e–5(k). We do so because our limited remand requires that the district court determine anew who may be considered a prevailing party in this case, and to what extent. *See Atonio II*, 827 F.2d at 449.[18] We direct that if the district court ultimately awards fees, it shall consider in its award fees for this appeal.

## V

We conclude that the Civil Rights Act of 1991 has no application to this case. Therefore, the rules governing disparate impact cases under Title VII that were articulated by the Supreme Court in *Wards Cove* govern the disposition of this appeal. We affirm the district court's determination in favor of the employers with regard to claims of disparate impact caused by subjective hiring criteria, nepotism, and messing arrangements. We determine, however, that the district court's failure to determine whether an impact arose from race-labelling or separate hiring channels necessitates a partial remand. A prior opinion of this court instructed the district court to address those issues, and nothing in the Supreme Court's opinion abrogated or modified that instruction. We also conclude that the district court failed to address the feasibility of the workers' alternatives to segregated housing, in response to the employers' business justification defense. We therefore vacate those portions of the district court's judgment and remand for further proceedings.

**AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH INSTRUCTIONS.** Each party will bear its own costs.

---

**18.** We also decline to address in the first instance the employers' claim to have made an offer of judgment under Rule 68, Federal Rules of Civil Procedure which the workers rejected. A party who rejects a Rule 68 offer and obtains a less favorable judgment is ordinarily required to pay the costs of its opponent. Because the offer, assuming that it was tendered, was rejected, it was never made part of the record. Rule 68 provides that a withdrawn offer is admissible only in a cost proceeding. Thus, it is for the district court to consider initially the intersection between Rule 68 and the Title VII fee provision in this case.