275 F.3d 797 (9th Cir. 2001)
 FRANK ATONIO; ALAN LEW; CURTIS LEW; JOAQUIN ARRUIZA; RANDY DEL FIERRO; CLARKE KIDO; LESTER KURAMOTO, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED; BARBARA VIERNES, AS ADMINISTRATRIX OF THE ESTATE OF GENE ALLEN VIERNES, PLAINTIFFS-APPELLANTS,
v.
WARDS COVE PACKING COMPANY, INC., A FOREIGN CORPORATION; BUMBLE BEE SEAFOODS, INC., A DOMESTIC CORPORATION; COLUMBIA WARDS FISHERIES, DEFENDANTS-APPELLEES.
 Nos. 99-35950, 99-36212
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted August 7, 2000
Filed Dec. 26, 2001
 
 Abraham Arditi, Seattle, Washington, for the plaintiffs-appellants.
 Douglas M. Fryer, Seattle, Washington, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington Justin L. Quackenbush, Senior District Judge, Presiding D.C. No. CV-74-00145-JLQBefore: Betty B. Fletcher, Cynthia Holcomb Hall, and A. Wallace Tashima, Circuit Judges.
 
 Per Curiam
 
 1
 This appeal is the final chapter in a long saga of trial, appeal, review on certiorari, and remands and again appeals. In a sense the case made new law--Congress disapproving the Supreme Court's interpretation of Title VII in this case changed the law--but explicitly made it inapplicable to further proceedings in this case.[1]
 
 
 2
 Justice White's summary in Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) for the Court of the factual setting that gave rise to this litigation is succinct. We quote it here:
 
 
 3
 The claims before us are disparate-impact claims, involving the employment practices of petitioners, two companies that operate salmon canneries in remote and widely separated areas of Alaska. The canneries operate only during the salmon runs in the summer months. They are inoperative and vacant for the rest of the year. In May or June of each year, a few weeks before the salmon runs begin workers arrive and prepare the equipment and facilities for the canning operation. Most of these workers possess a variety of skills. When salmon runs are about to begin, the workers who will operate the cannery lines arrive, remain as long as there are fish to can and then depart. The canneries are then closed down, winterized, and left vacant until the next spring. During the off-season, the companies employ only a small number of individuals at their headquarters in Seattle and Astoria, Oregon, plus some employees at the winter shipyard in Seattle.
 
 
 4
 The length and size of salmon runs vary from year to year, and hence the number of employees needed at each cannery also varies. Estimates are made as early in the winter as possible; the necessary employees are hired, and when the time comes, they are transported to the canneries. Salmon must be processed soon after they are caught, and the work during the canning season is therefore intense. For this reason and because the canneries are located in remote regions, all workers are housed at the canneries and have their meals in company-owned mess halls.
 
 
 5
 Jobs at the canneries are of two general types: "cannery jobs" on the cannery line, which are unskilled positions; and "noncannery jobs," which fall into a variety of classifications. Most noncannery jobs are classified as skilled positions. Cannery jobs are filled predominantly by nonwhites: Filipinos and Alaska natives. The Filipinos are hired through, and dispatched by, Local 37 of the International Longshoremen's and Warehousemen's Union pursuant to a hiring hall agreement with the local. The Alaska Natives primarily reside in villages near the remote cannery locations. Non-cannery jobs are filled with predominantly white workers, who are hired during the winter months from the companies' offices in Washington and Oregon. Virtually all of the noncannery jobs pay more than cannery positions. The predominantly non-white cannery employees live in separate dormitories and eat in separate mess halls.
 
 
 6
 In 1974, respondents, a class of nonwhite cannery workers who were (or had been) employed at the canneries, brought this title VII action against petitioners. Respondents alleged that a variety of petitioners' hiring/promotion practices--e.g., nepotism, a rehire preference, a lack of objective hiring criteria, separate hiring channels, a practice of not promoting from within--were responsible for the racial stratification of the workforce and had denied them and other non-whites employment as noncannery workers on the basis of race. Respondents also complained of petitioners' racially segregated housing and dining facilities. All of respondents' claims were advanced under both the disparate-treatment and disparate-impact theories of Title VII liability.
 
 Id. at 646-648 (footnotes omitted).[2]
 
 7
 On remand from the Supreme Court a panel of this court confirmed that despite the change in the statute, our court remains bound by the Supreme Court's ruling. Atonio v. Wards Cove Packing Co., 10 F.3d 1485 (9th Cir. 1993). In essence the Supreme Court held that although our court had determined that the plaintiffs had made out a prima facie case of disparate impact disfavoring minorities in hiring both in the skilled and unskilled non-cannery positions, that it erred in relying on plaintiffs' statistics to reach that result.
 
 
 8
 Our court had relied solely on a showing that a high percentage of non-whites held the cannery positions while a low percentage of minorities held non-cannery positions. The Court held that the proper comparison must be between the racial composition of the at-issue jobs and the racial composition of the qualified population in tthe relevant labor market. It remanded for further proceedings. Upon remand, the district court found that the statistics that plaintiffs advanced had the same flaws that the Supreme Court had found. Their statistics did not make out a prima facie case of disparate impact. On appeal our court concluded that the district court was not clearly erroneous.
 
 
 9
 Similarly the district court held that certain practices-nepotism, subjective hiring criteria, segregated messing-were not the cause of adverse impact on minorities in the atissue jobs. We found no clear error. Along the way the claim of disparate treatment was dropped. It is no longer an issue.
 
 
 10
 Ultimately, our court held in Atonio v. Wards Cove, 10 F.3d at 1504, that the following were the sole remaining issues to be remanded to the district court for further review and determination:
 
 
 11
 (1) Whether the fact of separate hiring channels with its accompanying practices deterred the individual claimants from applying for at-issue jobs;[3]
 
 
 12
 (2) Whether there was a feasible alternative to segregated housing;[4]
 
 
 13
 (3) Whether race-labeling created a discriminatory impact of its own force and the extent to which the practice may have had an adverse impact on integrated messing and bunking or on minority applications for, or hiring into at-issue jobs.
 
 
 14
 It is the district court's determination on those issues, based on the record made at the bench trial, that we now review. The district court in its August 9, 1999, order dismissed all remaining claims with prejudice.
 
 
 15
 In respect to separate hiring channels the court held that:
 
 
 16
 Plaintiffs have not established a prima facie case that separate hiring channels have caused a significant disparate impact on the class in any way and in particular Plaintiffs have not established a significant disparate impact on the class members' ability to learn of job opportunities or to obtain noncannery jobs. Even if they had set forth a prima facie case, Defendants have set forth a legitimate business justification for their hiring practices. Plaintiffs have not set forth any alternative that would be equally as effective as Defendants' chosen hiring procedures in serving the Defendants' legitimate business goals.
 
 
 17
 District Court Order at 47.
 
 
 18
 We conclude the district court's holding in this regard was adequately supported by the record. Plaintiffs' evidence was solely anecdotal, relying on the affidavits of nineteen claimants. The district court found that:
 
 
 19
 Basically, they claim they did not know how to apply for an at-issue job because the company did not tell them, not because they were hired from a separate hiring channel. Most of these individuals claim that they did not know how to apply because no job openings were posted at the canneries. Not one of the 19 claimants sets forth what, if any, qualification, skill, or experience he had for any at-issue job. Additionally, none of the 19 have established any evidence that any lack of information was caused by the fact they were hired from the primarily nonwhite union. None of the 19 even claim that the separate hiring channels deprived them of information that at-issue jobs were available.
 
 
 20
 District Court Order at 20-21.
 
 
 21
 In respect to race-labeling, the district court held that it did not cause a significant disparate impact. The district court expressed "a deep concern about the race labeling that took place at the canneries," District Court Order at 42, as do we, but the district court after examining all of the evidence concluded that it did not operate as a "headwind to minority advancement." Id. It noted,
 
 
 22
 While references to "Filipino," "Alaska Native," and "Eskimo," were frequent, inappropriate, and offensive to this court, these are not physically threatening or humiliating references. The evidence established that the class members themselves made reference to, for example, the "Filipino Bunkhouse." The union negotiators took great pride in the fact that the "Filipino crews" at the canneries were the best fish crews. The Superintendent of Wards Cove attempted to get a Filipino manager to avoid using the term "Filipino Bunkhouse" to no avail.
 
 
 23
 Likewise "Alaska Natives" is a term that was often used in the Alaska culture such as the "Alaska Native" Co-Operative Association, Bristol Bay"Native Association," Bristol Bay "Native Corporation." No class member testified that he was in any way offended by any race labeling or that it interfered with his work performance in any way. No class member testified that he was ridiculed or insulted by the race labeling or that he was physically threatened or humiliated by these comments or that he was deterred from applying for an at-issue job due to race labeling. Photographs that were exhibits in this case show employees of all races socializing together during the workers' free time indicating that there was no stigmatizing by race labeling and no disparate impact on nonwhites.
 
 
 24
 Plaintiffs cite 114 exhibits on the issue of race labeling. One hundred and ten of them are internal company documents with no evidence they were ever communicated to class members. Four exhibits were communicated to particular class members referring to "Eskimos," "native boys," and "Tentative Filipino crew." None of these class members have testified as to any impact on them as a result. Several class members testified that a foreman used the term "Filipino bunkhouse." However, the foreman who allegedly used the term was Filipino himself and clearly did not consider it an affront of any kind.
 
 
 25
 District Court Order 40-42.
 
 
 26
 We agree that the district court's holding is supported by the evidence.
 
 
 27
 On the last issue, the district court held that the plaintiffs' suggested alternative to segregated housing "would be an unnecessary burden and resulting cost to the Defendants and would not be as efficient in meeting Defendants' legitimate business goals as housing the workers by department, work hours, and arrival time." District Court Order at 46.
 
 
 28
 We hold that its finding was not clearly erroneous.
 
 
 29
 The law of the case is that there was business justification for the segregated housing by job category that resulted in substantial segregation by race. The plaintiffs' suggestion in essence is that employees who are already present when the cannery crews arrive be reassigned to different bunk houses in order to mix crews and provide racial balance. The court found that housing by job category had important advantages; different duty-reporting times in a bunk house would be disruptive (for example, cold storage workers report at 4:00 AM; cannery workers at 8:00 AM). Uninterrupted sleep is important because everyone works long, intense shifts. Requiring the moves after workers had settled in also would be disruptive in itself. We conclude that the district court's finding was not clearly erroneous.
 
 CONCLUSION
 
 30
 This appeal is not about, as the Supreme Court said in Wards Cove, 490 U.S. at 649 n.1, "whether we`approve' of [Defendants'] employment practices or the society that exists at the canneries, but rather, whether [Plaintiffs ] have properly established that these practices violate Title VII. " Nor is this appeal about how this litigation would have concluded had the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e2(k)(1)(B)(i) (Supp. III, 1991), been applicable. Nor is it about how this litigation might have concluded had the treatment claim not been dropped or the evidence of causation been better marshaled.
 
 
 31
 This last appeal turns on whether the district court's findings and conclusions on three narrow issues--the final shreds left after the dismissal of much more meaningful claims--were clearly erroneous. We conclude that they were not. We affirm the dismissal of the complaint with prejudice.
 
 
 32
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The salient changes to Title VII are set forth in Atonio v. Wards Cove Packing Co., 10 F.3d 1485, 1491 (1993):
 The [Civil Rights] Act [of 1991] significantly modifies the rules that the Supreme Court announced in Wards Cove. For example, the Act permits a plaintiff to challenge an employer's "decisionmaking process" as one employment practice causing a disparate impact, upon a showing that the elements of that process are inseparable for analysis. 42 U.S.C. §§ 2000e-2(k)(1)(B)(i) (Sup. III 1991). In addition, it restates the business necessity defense and places on the employer the burden of proving that a practice causing a disparate impact is "job related for the position in question and consistent with business necessity. " See id. §§ 2000e-2(k)(1)(A)(i). Nothing in the 1991 Act, however, modifies the central holding of Wards Cove that a disparate impact case cannot be established on the basis of a statistical disparity between the cannery work force and the noncannery "at-issue" jobs.
 The 1991 Act also contains an unusual provision. Section 402(b) of the Act states: CERTAIN DISPARATE IMPACT CASES.--Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983.
 105 Stat. at 1099, reprinted in 42 U.S.C.§§ 1981 note at 717 (Supp. III 1991). The case before us is the only one that appears to meet the criteria prescribed by section 402(b) for exemption from the statute.
 
 
 [2]
 Justice White in footnotes elaborated on the process of delivering fish, see Wards Cove, 490 U.S. at 646 n.2 ("Independent fishermen catch the salmon and turn them over to company-owned boats called `tenders,' which transport the fish from the fishing grounds to the canneries. Once at the cannery, the fish are eviscerated, the eggs pulled, and they are cleaned. Then, operating at a rate of approximately four cans per second, the salmon are filled into cans. Next, the canned salmon are cooked under precise time-temperature requirements established by the FDA, and the cans are inspected to ensure that proper seals are maintained on the top, bottom and sides.") (citations omitted) and described the noncannery positions at issue in the litigation. See id., at 647 n.3 ("The noncannery jobs were described as follows by the Court of Appeals:`Machinists and engineers are hired to maintain the smooth and continuous operation of the canning equipment. Quality control personnel conduct the FDA-required inspections and record keeping. Tenders are staffed with a crew necessary to operate the vessel. A variety of support personnel are employed to operate the entire cannery community, including for example, cooks, carpenters, store-keepers, bookkeepers, beach gangs for dock yard labor and construction. etc.' ") (citations omitted).
 
 
 [3]
 The district court erroneously found, contrary to the law of the case that there were no separate hiring channels and consequently did not consider the consequences of the practices thereby engendered.
 
 
 [4]
 Although the cannery showed business necessity as the reason for its segregated housing, the plaintiffs were entitled to show alternates to the segregated housing that would be feasible and cost effective. One of their suggested alternates was not evaluated by the district court. We held that plaintiffs were entitled to consideration of that alternative.