SEARIVER MARITIME FINANCIAL HOLDINGS INC.; SeaRiver Maritime, Inc.; Seariver Maritime International Inc., Plaintiffs–Appellants,

v.

Norman Y. MINETA, Secretary, United States Department of Transportation; John Ashcroft, Attorney General, United States Department of Justice; Native Village of Port Graham; Valdez Native Tribe, Defendants–Appellees.

No. 01–35762.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 3, 2002.

Filed Oct. 31, 2002.

E. Edward Bruce, Covington & Burling, Washington, DC, for the plaintiffs-appellants.

Mark B. Stern, Department of Justice, Civil Division, Washington, DC, for the defendants-appellees.

Before D.W. NELSON, THOMPSON and PAEZ, Circuit Judges.

**OPINION**

PAEZ, Circuit Judge.

At midnight on March 23, 1989, the T/V Exxon Valdez ran aground onto Bligh Reef in Alaska, spilling nearly eleven million gallons of oil into Prince William Sound (the "Sound"). The following year, Con- gress passed the Oil Pollution Act of 1990, increasing the penalties for oil pollution and instituting a regulatory regime aimed at improving oil tanker safety, preventing future oil spills, and enhancing oil spill response. *See* 33 U.S.C. §§ 2701–61. Section 5007 of the Oil Pollution Act (the "Act") (codified at 33 U.S.C. § 2737) ex- cludes from the waters of Prince William Sound any vessel that spilled more than one million gallons of oil into the marine environment after March 22, 1989. The Act effectively bars the Exxon Valdez from operating in Prince William Sound.

SeaRiver Maritime Financial Holdings, Inc. and SeaRiver Maritime International, the owners of the Exxon Valdez, and SeaRiver Maritime, Inc., its operator, (col- lectively, "SeaRiver") brought this action seeking, *inter alia,* a declaration that, as applied to SeaRiver, § 2737 is an unconsti- tutional bill of attainder and denies SeaRi- ver due process and equal protection in violation of the Fifth Amendment. The district court ruled that § 2737 did not violate the Constitution, and dismissed the complaint. SeaRiver appealed.

We affirm. We hold that § 2737 is not an unconstitutional bill of attainder be- cause it does not punish SeaRiver. We also hold that § 2737 does not violate the Due Process Clause of the Fifth Amend- ment because it furthers a rational legisla- tive purpose. Nor is § 2737 inconsistent with the Fifth Amendment's guarantee of equal protection because there is a rational basis for Congress to have concluded that excluding the Exxon Valdez from Prince William Sound would further the legiti- mate purpose of protecting the Sound's environment from future oil spills.

**BACKGROUND**

The T/V Exxon Valdez began operation in 1986 as an oil tanker, transporting oil from Valdez, Alaska, to California. It was

constructed at a cost of $125 million for the purpose of carrying oil from the Alaska North Slope to United States oil refineries. It is undisputed that the ship ran aground as a result of the actions of its master and crew.

On August 18, 1990, the President signed the Oil Pollution Act. 33 U.S.C. §§ 2701–61. In the Act, Congress recognized that Prince William Sound is an "environmentally sensitive area" and included provisions designed to protect the Sound's environment and reduce the likelihood of future oil spills. 33 U.S.C. § 2732(a)(2)(A). The Act established the Prince William Sound Oil Spill Recovery Institute and an Oil Terminal and Oil Tanker Environmental Oversight and Monitoring Demonstration Program for Prince William Sound. It provided for a Bligh Reef navigation light, a vessel tracking and alarm system, and increased equipment and requirements for oil spill response. 33 U.S.C. §§ 2731–35.

Section 2737 addressed the operation in Prince William Sound of vessels with histories of oil spills:

> Notwithstanding any other law, tank vessels that have spilled more than 1,000,000 gallons of oil into the marine environment after March 22, 1989, are prohibited from operating on the navigable waters of Prince William Sound, Alaska.

Between March 22, 1989, and August 18, 1990, when the Oil Pollution Act was enacted, no other tank vessel engaged in transporting Alaska North Slope oil from Prince William Sound had spilled more than one million gallons of oil into the marine environment. Within that same period, at least nine tank vessels transporting oil in other regions had each spilled more than one million gallons of oil into the water. Prior to March 22, 1989, and since the passage of the Act, numerous tank vessels have spilled more than the requisite amount of oil.

SeaRiver repaired the Exxon Valdez. On August 29, 1990, it passed all Coast Guard inspections, confirming that it met federal regulatory standards. The tanker was renamed the S/R Mediterranean.[1] It has apparently operated without spillage since its repair.

The Exxon Valdez oil spill spawned numerous civil and criminal actions. *See In re Exxon Valdez*, 270 F.3d 1215, 1224 n. 12 (9th Cir.2001) (listing cases).[2] The United States filed criminal charges against Exxon Corporation and Exxon Shipping, SeaRiver's predecessors, resulting in a plea agreement and fines that were remitted to $25 million. *See id.* at 1245–46. A consent decree resolving civil claims of the United States and the State of Alaska required Exxon to pay $100 million in restitution for governmental expenses spent on the cleanup and $900 million to restore damaged natural resources in exchange for the federal and state governments' release of all civil claims. *Id.*

## PROCEDURAL HISTORY

Plaintiffs brought this suit in the United States District Court for the Southern District of Texas seeking a declaration that

---

**1.** For ease of reference, we refer to the vessel as the Exxon Valdez.

**2.** *Exxon Valdez* involved an action for compensatory and punitive damages by entities that the oil spill affected. 270 F.3d at 1225. Exxon stipulated that its negligence caused the spill, *id.;* as a result, the only issue before

us was the validity of the $5 billion punitive damages award against Exxon. We rejected Exxon's challenges to the award of punitive damages, but remanded for consideration of the amount of those damages in light of intervening Supreme Court precedent. *Id.* at 1225–38, 1246–47.

§ 2737 is unconstitutional and injunctive relief against enforcement of § 2737 resulting from operation of the Exxon Valdez in Prince William Sound. Plaintiffs brought a separate suit in the United States Court of Federal Claims seeking just compensation under the Fifth Amendment for an alleged taking of the Exxon Valdez. The parties agreed to a stay in the Court of Federal Claims pending resolution of this action.

Ultimately, the case was transferred to the United States District Court for the District of Alaska. On June 4, 1998, the district court dismissed SeaRiver's claims, concluding that it had waived the right to challenge § 2737. We reversed the dismissal in an unpublished memorandum disposition and remanded for the district court to consider the constitutional issues. *Seariver Mar. Fin. Holding, Inc. v. Slater*, 243 F.3d 549 (9th Cir.2000) (unpublished table decision), *available at* 2000 WL 1763237. Defendants filed a motion for judgment on the pleadings, or in the alternative, for summary judgment. The district court granted Defendants' motion. It denied SeaRiver's cross-motion for summary judgment.

## DISCUSSION

SeaRiver advances three constitutional grounds for invalidating § 2737:(1) it is an unconstitutional bill of attainder; (2) it violates the Due Process Clause of the Fifth Amendment; and (3) it violates equal protection under the Fifth Amendment. We review *de novo* challenges to the constitutionality of a statute. *Gerling Global Reins. Corp. v. Low*, 296 F.3d 832,

837 (9th Cir.2002), *amended by* 2002 WL 31007789 (9th Cir. Sept.9, 2002). We also review *de novo* a grant or denial of summary judgment. *Id.*

### A. Bill of Attainder

SeaRiver urges us to reverse the district court's determination that § 2737 is not an unconstitutional bill of attainder. We decline, and hold that § 2737 does not work an attainder.[3]

The Constitution instructs Congress that "No Bill of Attainder ... shall be passed." U.S. Const. art. I, § 9, cl. 3. A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). The Bill of Attainder Clause implements the doctrine of separation of powers. *Id.* at 469, 97 S.Ct. 2777. "Just as Article III confines the Judiciary to the task of adjudicating concrete 'cases or controversies,' so too the Bill of Attainder Clause was found to 'reflect ... the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.'" *Id.* (quoting *United States v. Brown*, 381 U.S. 437, 445, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965)).

Three key features brand a statute a bill of attainder: that the statute (1) specifies the affected persons, and (2) inflicts punishment (3) without a judicial tri-

---

3. We assume, without deciding, that the Bill of Attainder Clause applies to corporations. The Supreme Court has not directly addressed this issue, although the Second Circuit recently concluded that corporations fall within the Clause's protection. *See Consoli-*

*dated Edison Co. v. Pataki*, 292 F.3d 338, 347 (2d Cir.2002) (holding that "the protection afforded by the Bill of Attainder Clauses is ... one of the constitutional rights enjoyed by corporations"), *petition for cert. filed*, Sept. 3, 2002 (No. 02–358).

al.[4] *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group,* 468 U.S. 841, 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). Statutes are presumed constitutional. *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Only the clearest proof suffices to establish the unconstitutionality of a statute as a bill of attainder. *Communist Party of United States v. Subversive Activities Control Bd.,* 367 U.S. 1, 83, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961). In judging the constitutionality of § 2737, "we may only look to its terms, to the intent expressed by Members of Congress who voted its passage, and to the existence or nonexistence of legitimate explanations for its apparent effect." *Nixon,* 433 U.S. at 484, 97 S.Ct. 2777. We conclude that § 2737 is not a bill of attainder because it does not inflict punishment.

### 1. Specificity of the Act

Whether § 2737 "specifies" SeaRiver, or singles it out, is a close question. We hold that it does.

■ The Supreme Court, and our case law, have established various guideposts to aid in determining whether legislation singles out a person or class within the meaning of the Bill of Attainder Clause. First, we look to whether the statute or provision explicitly names the individual or class, or instead, describes the affected population in terms of general applicability. *Selective Serv. Sys.,* 468 U.S. at 847, 104 S.Ct. 3348; *Nixon,* 433 U.S. at 469–71, 97 S.Ct. 2777; *see also Atonio v. Wards Cove Packing Co.,* 10 F.3d 1485, 1495 (9th Cir.1993). Our second focus, intricately connected with the first, is whether the identity of the individual or class was "easily ascertainable" when the legislation was passed. *Brown,* 381 U.S. at 448–49, 85 S.Ct. 1707; *United States v. Munsterman,* 177 F.3d

1139, 1141 (9th Cir.1999). Third, we examine whether the legislation defines the individual or class by "past conduct [that] operates only as a designation of particular persons." *Selective Serv. Sys.,* 468 U.S. at 847, 104 S.Ct. 3348; *Atonio,* 10 F.3d at 1495. Finally, we review whether the past conduct defining the affected individual or group consists of "irrevocable acts committed by them." *Selective Serv. Sys.,* 468 U.S. at 848, 104 S.Ct. 3348.

None of these characteristics alone determines the question before us, and we do not view them in isolation. Nor is this constellation of factors exclusive of other hallmarks of specificity that legislation may exhibit when it singles out a person or group in violation of the Bill of Attainder Clause. We conclude that, although the first of these guideposts does not support SeaRiver's position, the remaining three do. We also analyze whether § 2737's apparent focus on an object—the tank vessel—exempts it from protection under the Bill of Attainder Clause, which protects persons. We conclude that the legislation sufficiently links the vessel with its owners to support our conclusion that § 2737 singles out SeaRiver within the meaning of the Clause.

#### a. Terms of general applicability

The first guidepost does not support specificity here because the provision does not name SeaRiver. It is couched in general terms applicable to all tank vessels and to any oil spill of the requisite magnitude, in any marine environment. On its face, § 2737 does not single out SeaRiver.

#### b. Easily ascertainable individual or class

■ Our remaining guideposts, however, lead us to conclude otherwise. A stat-

4. There is no dispute that § 2737 complies with this third prong.

ute need not identify an individual or group by name to incur suspicion. *Atonio*, 10 F.3d at 1495. Here, the class of vessels that § 2737 would retrospectively affect—ten, including the nine that operated in other regions—was easily ascertainable when Congress enacted the Oil Pollution Act. *See Munsterman*, 177 F.3d at 1141 (stating that legislation that applies " 'either to named individuals or to easily ascertainable members of a group' " may constitute a bill of attainder " 'prohibited by the Constitution' " (*quoting Brown*, 381 U.S. at 448–49, 85 S.Ct. 1707)). Thus, our second guidepost favors a conclusion that the provision singles out the Exxon Valdez.

### c. Past conduct

The third inquiry bolsters this conclusion. The "singling out of an individual for legislatively prescribed punishment constitutes an attainder whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Selective Serv. Sys.*, 468 U.S. at 847, 104 S.Ct. 3348 (quoting *Communist Party*, 367 U.S. at 86, 81 S.Ct. 1357). Thus, this third inquiry seeks to determine whether the statute is retrospective, or whether it carries the potential to encompass a larger class than the individual or group allegedly targeted.

Section 2737 has a dual focus: it describes the affected class by both past and potential conduct. It defines the class of vessels excluded from Prince William Sound by the act of spilling a certain quantity of oil. The statute excludes from the Sound both vessels that spill oil after the date of enactment, and those that spilled oil between March 22, 1989 and the date of enactment. The effect of the March 22, 1989 date of the statute is to exclude the Exxon Valdez, while maintaining the status quo for other vessels that had spilled

more than the requisite gallons of oil prior to March 22, 1989.

In delineating the past conduct by date, § 2737 is evocative of an "unusual provision" of the Civil Rights Act of 1991 that excluded the plaintiffs in *Atonio* from the Act's pro-plaintiff effects. 10 F.3d at 1491. The provision stated: "nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983." *Id.* Only the *Atonio* case met this description. We determined that the statute specified a class based on past conduct, "composed solely of [the] plaintiffs on the basis of their having brought this action. . . ." *Id.* at 1496. Like the plaintiffs in *Atonio*, the specificity of the date that appears in the statute targets the past conduct of the Exxon Valdez.

In ruling that § 2737 did not meet the specificity requirement, the district court reasoned that the statute also applied to other vessels and their owners. The provision's terms of general applicability, and its open-ended application to future tank vessels that spill sufficient oil, give us pause. Unlike the dates appearing in the statute in *Atonio* which, like bookends, set apart the plaintiff class from all other plaintiffs, § 2737 merely sets a start date for its effect and applies to all tank vessels prospectively. In time, § 2737 has the potential to impact a greater and growing number of vessels. The concern underlying the Bill of Attainder clause relating to "legislative interferences[ ] in cases affecting personal rights," *Brown*, 381 U.S. at 444 n. 18, 85 S.Ct. 1707, quoting *The Federalist No. 44*, at 351 (James Madison) (Hamilton ed., 1880), loses some force under these circumstances. When a statute's retrospective impact on an individual or group is tied to a prospective risk to a larger and more generally defined class,

that prospective and generalized effect tempers the concerns of "tyranny" by the "multitude" that motivated the inclusion of the Bill of Attainder Clause. *See Brown,* 381 U.S. at 443, 85 S.Ct. 1707.

For that reason we do not, as SeaRiver urges, exclude from our analysis the open-ended nature of the provision in favor of a myopic focus on its retrospective effect. We agree with SeaRiver, however, that there is an overriding significance to the specific date in the statute. The date singles out the Exxon Valdez on the basis of a past act that other oil tank vessels operating in Prince William Sound had not committed as of the date the Act was passed.

### d. Irreversible acts

The fourth guidepost requires us to examine whether the provision defines the specific class of persons affected by the "irreversible acts committed by them." *Selective Serv. Sys.,* 468 U.S. at 848, 104 S.Ct. 3348. If the defining act is irrevocable, the individual or class may not escape the effect of the legislation by correcting the past conduct, thereby exiting the targeted class. *See id.* at 851, 104 S.Ct. 3348 (upholding a statute denying financial aid to students who failed to register for the draft because ineligibility was " 'made to turn upon [a] continuingly contemporaneous fact' which a student who wants public assistance can correct" (*quoting Communist Party,* 367 U.S. at 87, 81 S.Ct. 1357)).

Section 2737 focuses on irrevocable conduct. In reaching back prior to its date of enactment, the retrospective aspect of § 2737 defines the class-owners and operators of oil tank vessels—by the irreversible

act of having spilled a specified quantity of oil. A similar focus on irreversible conduct marred two laws that the Supreme Court struck down as bills of attainder following the Civil War. In *Cummings v. Missouri,* the Supreme Court invalidated a state constitutional provision that, among other deprivations, compelled those seeking to hold specified offices or seeking to practice specified callings to swear an oath that they had never assisted or sympathized with the enemies of the United States, including the Confederacy. 4 Wall. 277, 71 U.S. 277, 316–17, 18 L.Ed. 356 (1866). In *Ex parte Garland,* 4 Wall. 333, 71 U.S. 333, 334–35, 18 L.Ed. 366 (1866), the Court struck down a law requiring attorneys to swear an oath that they had never aided persons engaged in armed hostility to the United States, including the Confederacy. In both cases, the affected group was "defined entirely by irreversible acts committed by them." *Selective Serv. Sys.,* 468 U.S. at 848, 104 S.Ct. 3348; *see also Pierce v. Carskadon,* 16 Wall. 234, 83 U.S. 234, 21 L.Ed. 276 (1872). Here, § 2737 singles out SeaRiver by excluding its ship from Prince William Sound based on the irreversible acts occurring prior to the passage of the Act that resulted in the Exxon Valdez oil spill.[5]

\* \* \*

■ We conclude, in sum, that § 2737 bears the first marking of a bill of attainder. However, our analysis to this point has proceeded on the assumption that in enacting § 2737 Congress sought to target not only the vessel, but its owners and operators as well. The district court con-

---

**5.** We distinguish § 2737 on this basis from the Presidential Recordings and Materials Preservation Act, 44 U.S.C. § 2107 note (1977), directing the Administrator of General Services to take custody of Nixon's papers. *Nixon,* 433 U.S. at 471–72, 97 S.Ct. 2777. In

*Nixon,* the Supreme Court reasoned that the Act singled out Nixon based not on his past and irrevocable acts, but rather, on the " 'imminent danger that the tape recordings would be destroyed.' " *Id.*

cluded that the specificity requirement was not met because the provision focused on the Exxon Valdez, and the ship is property, not a person. We disagree.

If the law targets the Exxon Valdez, and not its owners, it is not a bill of attainder. The Clause is concerned with punishment of individuals, not objects. *See Fresno Rifle & Pistol Club, Inc. v. Van De Kamp*, 965 F.2d 723, 728 (9th Cir.1992) (clarifying that a statute restricting the use of assault weapons and listing those weapons by the manufacturer's name specified punishment based not only on the manufacturer's identity, but on "particular firearms which it has found are particularly dangerous," and holding that the statute was not an attainder);[6] *see also Cummings*, 71 U.S. at 320 (striking down a statute when it "was intended to reach the person, not the calling").

A statute that singles out individuals or groups by targeting their property may still be a bill of attainder. "A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both. In this form the power of the legislature over the lives and fortunes of individuals is expressly restrained." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 138, 3 L.Ed. 162 (1810). In *Cummings*, the Supreme Court articulated the link between an attainder and its potential to unconstitutionally impact property rights: " '[T]he people of the United States, in adopting [the Constitution containing the Bill of Attainder Clause] have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men

are exposed.' " 71 U.S. at 322 (quoting *Fletcher*, 10 U.S. (6 Cranch) at 137). Thus, we must decide whether § 2737 targets only the Exxon Valdez, and not its owners or operator.

On its face, § 2737 targets "tank vessels" that have spilled oil. It makes no mention of those who own, operate, or control them. The Act's legislative history tends to refer to the oil spill from the Exxon Valdez, without distinguishing the vessel from its owners. H.R. Conf. Rep. No. 101–653, at 114, 136, 146, 155–56, 158, 167 (1990); S.Rep. No. 101–94, at 2, 15, 18, 19 (1989). Congress appears to have been concerned not only with the tank vessel itself, but with its operation. *See e.g.,* H.R. Conf. Rep. No. 101–653, at 136 (noting that the crew's small size and its fatigue may have contributed to the Exxon Valdez's grounding); *see also* S.Rep. No. 101–94, at 15. SeaRiver, or its previous incarnation as the Exxon Shipping Company, continued to own the vessel from the time Congress drafted the Act until it was enacted. We cannot state with confidence that Congress enacted § 2737 solely to influence voters who would be inflamed by the return of the ship to Prince William Sound, regardless of whether SeaRiver continued to own it or had sold it prior to the Act's passage. Under these circumstances, the vessel and its owners and operators are too closely connected for us to conclude that Congress intended to single out the vessel without regard to who owned or operated it. Mindful also of the significance of the separation of powers concerns that the Bill of Attainder Clause evokes, *Brown*, 381 U.S. at 442–43, 85

---

**6.** The weapons manufacturers in *Fresno Rifle* brought their challenge under section 10, clause 1 of Article I of the Constitution, which prohibits the states from enacting bills of attainder. 965 F.2d at 727. SeaRiver challenges § 2737 under section 9, clause 3.

Consistent with *Fresno Rifle*, we do not distinguish in our analysis between the Bill of Attainder Clauses in section 10, which applies to the states, and in section 9, which applies to Congress. *Id.*

S.Ct. 1707, we conclude that the provision specifies the Exxon Valdez at least in part as a means of reaching its owners. *See Fresno Rifle*, 965 F.2d at 728 (analyzing whether legislation that identified manufactured goods by specifying the manufacturer's name constituted "economic punishment").

Having decided that the provision jointly addresses the Exxon Valdez and the persons who own and operate it, and having encountered in § 2737 signs indicating that the provision singles out the ship and its owners, we conclude that § 2737 displays the first hallmark of a bill of attainder.

### 2. Infliction of Punishment

▮▮▮▮ That the March 22, 1989, date of the statute sweeps into its purview only the Exxon Valdez is not dispositive here. Section 2737 is not a bill of attainder because it does not inflict punishment on SeaRiver. Three inquiries determine whether a statute inflicts punishment on the specified individual or group: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Serv. Sys.*, 468 U.S. at 852, 104 S.Ct. 3348 (quoting *Nixon*, 433 U.S. at 473, 475–76, 478, 97 S.Ct. 2777); *see also Fresno Rifle*, 965 F.2d at 728. We also consider whether less burdensome alternatives would have achieved the same non-punitive purpose. *Nixon*, 433 U.S. at 482, 97 S.Ct. 2777.

A statute need not satisfy all of these factors to constitute a bill of attainder. *Nixon*, 433 U.S. at 473–78, 97 S.Ct. 2777; *Consolidated Edison*, 292 F.3d at 350.

Rather, we weigh these factors together in resolving a bill of attainder claim. *Id.*

### a. The historical meaning of legislative punishment

Section 2737 evinces none of the historical means of punishment that characterize an unconstitutional bill of attainder. Traditionally, bills of attainder sentenced the named individual to death, imprisonment, banishment, the punitive confiscation of property by the sovereign, or erected a bar to designated individuals or groups participating in specified employments or vocations. *Nixon*, 433 U.S. at 473–74, 97 S.Ct. 2777.

▮▮▮▮ The district court correctly rejected SeaRiver's contention that prohibiting the Exxon Valdez from entering Prince William Sound falls within the historical meaning of banishment. Banishment has traditionally been associated with deprivation of citizenship, and "does more than merely restrict one's freedom to go or remain where others have the right to be: it often works a destruction of one's social, cultural, and political existence." *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 897 (2d Cir.1996). Banishment thus refers to individuals, not to property such as an oil tanker. *Trop v. Dulles*, 356 U.S. 86, 101–02, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (analogizing to banishment in holding that the Eighth Amendment prohibits the use of denationalization as punishment). It describes an ouster from the individual's home city, country, or territory, not the exclusion of a ship from a body of water. *Id.; Yepes–Prado v. INS*, 10 F.3d 1363, 1369 n. 11 (9th Cir.1993). The statute does not banish from Prince William Sound either SeaRiver or any individual associated with SeaRiver.

Nor does the statute bar the SeaRiver plaintiffs from any form of employment. *See Nixon*, 433 U.S. at 474, 97 S.Ct. 2777.

It is undisputed that SeaRiver continues to transport oil through Prince William Sound.

### b. Furtherance of non-punitive legislative purposes

 Whether a statute falls within the historical meaning of punishment is only one factor in our analysis. We would not decline to hold that legislation with an indisputably punitive purpose was a bill of attainder merely because Congress employed unconventional means. Rather, we apply a "functional test" to ensure that the legislature has not fashioned new burdens and deprivations that are inconsistent with the Constitution's guarantee against bills of attainder. *Nixon*, 433 U.S. at 475, 97 S.Ct. 2777. This test inquires:

> whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes. Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decision-makers.

*Id.* at 475–76, 97 S.Ct. 2777 (internal citations omitted). Thus, even if the Act singles out an individual on the basis of irreversible past conduct, if it furthers a nonpunitive legislative purpose, it is not a bill of attainder. *Id.*

SeaRiver has not carried its burden, as the "one who complains of being attainted," of establishing "that the legislature's action constituted punishment and not merely the legitimate regulation of conduct." *Id.* at 476 n. 40, 97 S.Ct. 2777. Section 2737 furthers a non-punitive purpose: that of protecting the environment within Prince William Sound from a heightened risk of harm from oil spills. The provision affords protection to Prince William Sound by excluding from it the risk of a future spill from the tank vessel involved in one of the largest oil spills in U.S. history.

In determining that § 2737 passes *Nixon's* functional test, we conclude that (1) passage of § 2737 has "legitimate justifications" and is a "legitimate regulation of conduct," *see id.* at 476 & n. 40, 97 S.Ct. 2777; *Selective Serv. Sys.*, 468 U.S. at 851, 104 S.Ct. 3348, (2) the provision addresses an immediate or prospective risk, *see Selective Serv. Sys.*, 468 U.S. at 851–52, 104 S.Ct. 3348, and (3) the alternative means of furthering the legislative purpose that SeaRiver offers would not eliminate the risk that § 2737 addresses, *see Nixon*, 433 U.S. at 482–83, 97 S.Ct. 2777.

#### 1. Legitimate justification

First, § 2737 constitutes a "legitimate regulation of conduct," *see Selective Serv. Sys.*, 468 U.S. at 851, 104 S.Ct. 3348, in that it prohibits SeaRiver from operating in Prince William Sound a vessel with a history of substantial spillage, and encourages SeaRiver and other tank vessel owners to take greater steps to avoid a similar spill in any marine environment. Congress's interest in preventing future oil spills is a "legitimate justification" for excluding the Exxon Valdez from the Sound. *Nixon*, 433 U.S. at 476, 97 S.Ct. 2777. We cannot say that a focus on the future operation of a ship that previously spilled eleven million gallons of oil into Prince William Sound, or on those responsible for the ship's safe operation, is illegitimate or unjustified.

The fact that the provision places an additional burden upon SeaRiver does not affect our conclusion. Although Congress was aware when it passed § 2737 that it would impose a cost on SeaRiver, this awareness does not translate into a suggestion that Congress's intent was to pun-

ish, rather than to reduce the environmental risk to the Sound.[7] *See Atonio*, 10 F.3d at 1496 (holding that, although Congress was aware that the statute would impose a burden on cannery workers, it did not intend to punish those workers).

In this respect, this case is similar to *Gerling Global*, where we upheld a statute that placed new burdens on insurance companies on the basis of past actions. 296 F.3d at 850–51. The statute required insurance companies that held policies from the Holocaust era to publicly register with a state agency. *Id.* at 836. Although the statute potentially subjected the companies to embarrassment and increased claims, *id.* at 850, we upheld it. The statute's legitimate nonpunitive purposes included providing data to Holocaust victims and their families about claims, protecting California citizens from insurance companies with histories of questionable practices, and disclosing to California citizens the character of the insurance companies. *Id.* at 850–51.

This case and *Gerling Global* are unlike cases in which there was no link between the consequence that the statute imposed and the individual's past conduct. In *Cummings*, for instance, the Court concluded that in imposing a loyalty oath as a requisite for certain professions, "a qualification having no possible relation to [ ]

fitness" for those professions, the statute "was intended to reach the person, not the calling." 71 U.S. at 320. Here, by contrast, § 2737 draws a definitive link between the Exxon Valdez's history and its fitness to traverse Prince William Sound's environmentally sensitive waters.

### 2. Focus on prospective risks

Second, the provision addresses a prospective risk to the environment and to third parties. *See Fresno Rifle*, 965 F.2d at 728 (holding that motivation behind statute was "to protect the safety and welfare of the citizens of California"). Congress may legitimately conclude that a vessel that has spilled over one million gallons of oil poses a greater risk to Prince William Sound than other tank vessels, either because of a pre-existing defect, damage incurred as a result of the spill, or because the spill calls into question the practices of its operators. *See id.* ("In light of the Legislature's concern that assault weapons present an unreasonable danger of harm to human life, legitimate justifications for passage of the Act are readily apparent.") (internal quotations and citations omitted). The concern that the Exxon Valdez presents an unreasonable risk to Prince William Sound is sufficient to justify the re-

---

**7.** In *Consolidated Edison*, the Second Circuit considered a bill of attainder challenge to a state law that allocated all of the costs of a previous power outage to the power company that had negligently caused the outage. 292 F.3d at 352. The court reasoned that the legislature may legitimately decide that, between a negligent party and innocent third parties, the negligent party "should bear the costs attributable to its negligence." *Id.* The Second Circuit held, however, that the statute was a bill of attainder because it allocated a greater share of the costs to the company than the company would have paid in the absence of its negligence. *Id.* at 352–53. This excessive allocation could not be squared with the po-

tential nonpunitive purposes of prevention of harm to third parties and deterring similar conduct by Consolidated Edison and other power companies in the future. *Id.* at 351–53. Here, in enacting § 2737, Congress has allocated not the past cost of the oil spill, as in *Consolidated Edison*, but the risk of a future oil spill. Congress may legitimately conclude that, between SeaRiver and Prince William Sound, SeaRiver should bear the cost of preventing a future oil spill. This allocation serves the legitimate nonpunitive purposes of preventing harm to third parties and deterring similar conduct by SeaRiver and other tank vessels.

striction on SeaRiver's use of the vessel in that area.

Section 2737's focus on SeaRiver's future use of the Exxon Valdez calls to mind the circumstances in *Nixon*. There, former President Nixon's agreement with the Administrator of General Services called for destruction of his papers and tapes under certain conditions. The Court held that the subsequent legislation's singular focus on preserving Nixon's records, to the exclusion of the records of other Presidents, did not constitute an attainder because "only [Nixon's] materials demanded immediate attention." 433 U.S. at 472, 97 S.Ct. 2777. Nixon "constituted a legitimate class of one," providing "basis for Congress' decision to proceed with dispatch with respect to his materials while accepting the status of his predecessors' papers and ordering the further consideration of generalized standards to govern his successors." *Id.* Here, it is reasonable for Congress, acting to protect a sensitive environmental area, to "proceed with dispatch" to remove a tank vessel from Prince William Sound to reduce the risk of a recurrence of oil spillage. As in *Nixon*, the legislation focuses on excluding what Congress perceived as an *immediate* danger, while establishing a deterrent to future spills. *Id.* at 472, 97 S.Ct. 2777; *see also Fresno Rifle*, 965 F.2d at 728 (stating that "we cannot say that the Legislature intended to punish specific individuals; rather, its intent was to control types of weapons").

Finally, SeaRiver contends that Congress's intent can only have been to punish the tanker's owners because it is undisputed that the tanker ran aground as a result of the actions of its master and crew and the ship's construction did not cause the collision. Defendants counter that Congress could have rationally concluded that tank vessels involved in major spills could subsequently prove less safe due to damage or an antecedent defect.

It is of no import whether Congress acted on the basis that the owners of the vessel may be more likely than others to tolerate practices that risk a future spill, that the vessel's construction contributed to the magnitude of the event, or that the collision reduced the likelihood of subsequent safe operation. Congress may decline to undertake a prolonged factual inquiry into the allocation of responsibility between vessel and operator for the occurrence and magnitude of the spill, and instead allocate responsibility to both in a single provision designed to prevent a recurrence of a similar incident.

### c. The legislative record and the intent to punish

The third hallmark of a punitive statute is a legislative record that " 'evinces a congressional intent to punish.' " *Selective Serv. Sys.*, 468 U.S. at 852, 104 S.Ct. 3348. We seek to determine whether the legislative record is probative of nonpunitive intentions or instead evidences legislative overreaching that enlivens "the fear that the legislature, in seeking to pander to an inflamed popular constituency," found it "expedient openly to assume the mantle of judge—or, worse still, lynch mob." *Nixon*, 433 U.S. at 480, 97 S.Ct. 2777. The legislative history of the Oil Pollution Act does not unmistakably manifest such a motive. *See Selective Serv. Sys.*, 468 U.S. at 855 n. 15, 104 S.Ct. 3348 (explaining that there was no congressional motive to punish underlying § 12(f)).

Because § 2737 was inserted in conference, and the subsequent debates on the conference report that contained the bill do not mention the provision, it is essentially bereft of legislative history. H.R. Conf. Rep. No. 101–653, at 159 (describing, without comment, the text of § 2737). Ap-

parently, Senator Ted Stevens of Alaska inserted the provision in conference,[8] but no comment in the legislative record sheds light on his motive in inserting it nor on the conferees' reasons for agreeing to its inclusion.

During the congressional debate over the conference report, the causes of the Exxon Valdez oil spill were still under investigation. S.Rep. No. 101–99, at 2 (1990). It was not clear "whether it was the ship or its captain that actually caused the disaster." *Seariver Mar. Fin. Holdings, Inc. v. Pena*, 952 F.Supp. 9, 11 (D.D.C.1997). It is therefore difficult to determine whether, in including § 2737, Congress had in mind the ship's owners, factors surrounding the construction of the ship itself, or both.

The legislative record reveals that Congress's purpose in passing the Oil Pollution Act was remedial, not punitive. The primary goals of the Act are to prevent oil spills and protect Prince William Sound. 136 Cong. Rec. S11537 (daily ed. Aug. 2, 1990). When discussing the conference committee report that contained § 2737, members of Congress expressed concern about the number of oil spills across the nation, including the Exxon Valdez spill. *See* 136 Cong. Rec. S11537–38, at S11542, S11545–46, S11548 (daily ed. Aug. 2, 1990); 136 Cong. Rec. H6933–02, at H6942, H6935 (daily ed. Aug. 3, 1990). There were also suggestions that current regulations were inadequate to effectively govern the tanker fleet. 136 Cong. Rec. H6920–02, at H6932 (daily ed. Aug. 3, 1990).

Because these statements relate to the Act as a whole, or to the provisions surrounding § 2737, they are not conclusive evidence of congressional intent regarding the retrospective nature of § 2737. Nevertheless, they confirm that the legislation as a whole was designed to serve nonpunitive purposes.

██ A "formal legislative announcement of moral blame worthiness or punishment" is not a necessary aspect of an unlawful bill of attainder. *Nixon*, 433 U.S. at 480, 97 S.Ct. 2777. And departure from established legislative procedures may suggest an improper purpose. *Arlington Heights v. Met. Hous. Dev. Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The congressional silence surrounding § 2737 impedes SeaRiver in successfully carrying its burden on this factor. Absent more compelling support in the record, we cannot conclude that there is "unmistakable evidence of punitive intent." *Selective Serv. Sys.*, 468 U.S. at 855 n. 15, 104 S.Ct. 3348 (quoting *Flemming v. Nestor*, 363 U.S. 603, 619, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)).

### d. Less Burdensome Alternatives

Finally, "[i]n determining whether a legislature sought to inflict punishment on an individual, it is often useful to inquire into the existence of less burdensome alternatives by which [Congress] could have achieved its legitimate nonpunitive objectives." *Nixon*, 433 U.S. at 482, 97 S.Ct. 2777. SeaRiver argues that Congress could have restricted its actions to purely prophylactic measures. However, this would not have achieved the purpose of excluding from Prince William Sound a vessel with a history of major oil spillage. A "rational and fairminded Congress" may have decided that tailoring the provision to the ship involved in the disaster, rather than prohibiting its owners or operators

---

**8.** *See* Alison C. Carrigan, Comment, *The Bill of Attainder Clause: A New Weapon to Challenge the Oil Pollution Act of 1990*, 28 B.C. Envtl. Aff. L.Rev. 119, 160 & n. 357 (2000) (citing a contemporaneous news report).

entirely from oil-transporting activities in the Sound, would be less objectionable. *See Nixon*, 433 U.S. at 483, 97 S.Ct. 2777.

Nonetheless, SeaRiver argues that in passing § 2737, Congress has encroached upon the separate power of the judiciary to "rul[e] upon the blameworthiness of, and levy[ ] appropriate punishment upon, specific persons." *See Brown*, 381 U.S. at 445, 85 S.Ct. 1707. SeaRiver's urgings, however, would steer us toward a greater danger: that by restricting Congress to legislating at greater levels of generality, we would "cripple the very process of legislating" by striking down every Act that "burdens some persons or groups but not all other plausible individuals." *Nixon*, 433 U.S. at 470–71, 97 S.Ct. 2777. In *Nixon*, the Supreme Court cautioned us that, although the Bill of Attainder Clause erects an important " 'bulwark against tyranny,' " it does not confine Congress to "legislating for the universe, or legislating only benefits, or not legislating at all." *Id.* at 471, 97 S.Ct. 2777.

Were we to declare unconstitutional Congress's decision to include the Exxon Valdez (and all other vessels involved in large oil spills between March 22, 1989, and the date of enactment) within the scope of the statute, or require that the statute regress infinitely in time to encompass all oil-spilling tank vessels, we would ourselves encroach on legislative territory. We decline to assume the mantle of the legislature in determining the date that a statute must take effect, or in framing and quantifying the class that the legislation may permissibly affect.

We conclude, in sum, that § 2737 does not utilize conventional legislative punishment, that it rationally serves a non-punitive purpose, and that the legislative record of its passage does not support a punitive purpose on the part of Congress.[9]

**B. The Fifth Amendment Due Process Challenge**

 Section 2737 does not violate the Due Process Clause of the Fifth Amendment. SeaRiver contends that § 2737 offends Fifth Amendment due process considerations because it applies retroactively and is arbitrary and irrational. In addressing a challenge to a statute as unconstitutionally retroactive, we consider (1) whether Congress clearly expressed its intent that the statute apply retroactively, and if so, (2) whether the statute is justified by a rational legislative purpose. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (explaining that retroactive legislation violates the Fifth Amendment unless it is justified as a rational measure); *Koch v. SEC*, 177 F.3d 784, 785 (9th Cir.1999) (setting forth the dual considerations governing whether retroactive legislation is constitutional) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)).

Here, assuming that Congress intended that § 2737 operate retroactively, the provision would not violate the Fifth Amendment because its allegedly retroactive application furthers a rational legislative purpose. *Landgraf*, 511 U.S. at 266, 114 S.Ct. 1483 (explaining that legislation comports with the Due Process Clause if "the

---

**9.** In its ruling in this case, the district court addressed SeaRiver's contention that the provision is an unconstitutional *ex post facto* law. *See Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (describing the *ex post facto* clause of

the Constitution as aimed at laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts") (internal quotations and citations omitted). SeaRiver does not raise that claim on appeal, and we do not address it.

retroactive application of the legislation is itself justified by a rational legislative purpose"). SeaRiver argues that the March 22, 1989, date is arbitrary because it excludes many vessels that in the past spilled large quantities of oil. However, the rational legislative purpose here is Congress's goal, noted above, of preventing future oil spills and protecting the marine environment of Prince William Sound by excluding vessels such as the Exxon Valdez. While a justification "sufficient to validate a statute's prospective application under the Clause may not suffice to warrant its retroactive application," *id.*, the government's proffered reason is sufficient. Congress could rationally have believed that the Exxon Valdez, which in the past spilled almost eleven million gallons of oil in Prince William Sound, presents a greater risk of spilling again, and should be excluded.

## C. The Fifth Amendment Equal Protection Challenge

SeaRiver alleges that § 2737 denies equal protection by singling it out for selective retroactive application because it was a politically unpopular target. It argues that burdening one ship by excluding it from Prince William Sound results in treatment unequal to other ships that have in the past spilled large amounts of oil. A successful equal protection claim may be brought by a "class of one," when the plaintiff alleges that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); *see also Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir.1995) ("Classifications should be scrutinized more carefully the smaller and more vulnerable the class is. A class of one is likely to be the most vulnerable of all.").

The statutory classification that SeaRiver defines does not implicate a "suspect class," and SeaRiver does not allege that the classification, by itself, infringes on fundamental constitutional rights. Therefore, the statute comports with equal protection if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Zobel v. Williams*, 457 U.S. 55, 60, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) ("Generally, a law will survive that scrutiny if the distinction it makes rationally furthers a legitimate state purpose."); *see also Atonio*, 10 F.3d at 1493–94. Although the legislative history of § 2737 does not explicitly reveal Congress's motive in adding the provision, the government's proffered rationale suffices that Congress intended to protect Prince William Sound from the risk of another oil spill from the same vessel. *See Beach Communications*, 508 U.S. at 315, 113 S.Ct. 2096 (stating "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature"); *see also Atonio*, 10 F.3d at 1494.

SeaRiver contends that there is no rational relationship between the March 22, 1989, "trigger date" and the government's proffered reason that Congress could have been concerned that the Exxon Valdez would rupture again because § 2737 fails to bar from the Sound other vessels that had prior spills. We disagree. "[M]ere underinclusiveness is not fatal to the validity of a law" under the Fifth Amendment's guarantee of equal protection. *Atonio*, 10 F.3d at 1495 (quoting *Nixon*, 433 U.S. at 471 n. 33, 97 S.Ct.

2777). It is reasonable for Congress to single out the Exxon Valdez due to the magnitude of the spill and the sensitivity of the area where the spill occurred. It is also rational for Congress to use this past disaster as a measure of future performance to specifically bar the Exxon Valdez from transporting oil through Prince William Sound, an area that Congress has accorded special statutory protection. *See id.* (reasoning that "we generally lack authority to invalidate a public law under the rational basis test merely because that law narrowly targets one or a few individuals"); *Gerling Global,* 296 F.3d at 850–51.

█ The fact that the legislature could have chosen an earlier or later effective date does not establish an equal protection violation. *United States R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (noting "the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration"). A legislative choice "may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications,* 508 U.S. at 315, 113 S.Ct. 2096. "It is enough that plausible reasons for Congress' action exist." *Atonio,* 10 F.3d at 1494.

We conclude, therefore, that § 2737 does not deny SeaRiver the equal protection of the law.

**CONCLUSION**

In sum, § 2737 is not an unconstitutional bill of attainder and does not deny SeaRiver due process or equal protection in violation of the Fifth Amendment. The district court's ruling in favor of Defendants is

AFFIRMED.